Allen v. Forsythe et al.

---

ERNEST A. ALLEN, Respondent, v. WILLIAM FORSYTHE, WARREN FORSYTHE, ARTHUR FORSYTHE, BENJAMIN HERNDON and RENA HERNDON, Appellants.

Kansas City Court of Appeals, January 9, 1912.

1. HUSBAND AND WIFE: Alienation of Affections: Damages. A husband is entitled to recover damages in an action against such as persuade the wife to live separate from him without a sufficient cause or against such as take her away either by fraud and persuasion or open violence.

2. ———: ———: ———. The law encourages matrimony, and the state is interested in maintaining the stability of the marriage relation, and will not tolerate even parental interference not prompted by love and desire to promote the child's welfare.

3. ———: ———: ———: Conspiracy: Joint Tort-feasors. Where several wrongdoers are joined as defendants charged with the same tort, plaintiff may dismiss, at any stage of the proceedings, as to any one of them, without affecting the merit of the action as to the others.

Appeal from Carroll Circuit Court.—*Hon. Francis H. Trimble,* Judge.

AFFIRMED (*conditionally*).

*L. H. Waters, Frank Sheetz* and *Jones & Conkling* for appellants.

*Lozier, Morris & Atwood* for respondent.

JOHNSON, J.—This is a suit for damages for the alienation of the affections of the wife of plaintiff. Defendant William Forsythe is the father of plaintiff's wife, defendants Warren Forsythe and Rena Herndon are her brother and sister, and defendant Benjamin Herndon is the husband of Rena. Arthur Forsythe, another brother of plaintiff's wife, also was joined with the defendants but at the conclusion of the evidence his request for a peremptory instruction was sustained and he was dismissed. The cause was submitted as to the remaining defendants and the jury returned a verdict against them in favor of plaintiff for compensatory damages in the sum of six thousand dollars. Defendants moved for a new trial and in arrest of judgment and after their motions were overruled appealed to this court.

One of their principal contentions is that their demurrers to the evidence should have been given and we shall state and consider the facts in their aspect most favorable to plaintiff, as we must in passing on a demurrer to the evidence.

The abstract of the record contains over 700 pages of evidence. The examination of the principal actors in the domestic tragedy was voluminous and searching. The events which gave rise to the legal controversy appear to have been of absorbing public interest in the community where they occurred and many strangers to this suit were drawn into their vortex and were

called as witnesses by one side or the other. Consequently the evidence embraces a vast mass of details of more or less evidentiary value and abounds in warmly contested minor issues, but the controlling facts of the case are comparatively few and really are undisputed though, on the surface, they appeár to be vigorously contested. We shall avoid the circumstantial labyrinth through which counsel vainly travel in their briefs and arguments and shall state the facts in our own narrative and without reference to details or to any but ultimate facts.

The Allen and Forsythe families were neighbors and friends and the plaintiff, Ernest Allen, was a young man of high standing, exemplary habits and able to support a wife in a manner suitable to the station in life of the respective families. He was the accepted suitor of Verline, the youngest daughter of William Forsythe, and both families gave the proposed marriage their unqualified approval. The young woman was over eighteen years of age and, therefore, capable in law of making her own marital contracts, but she was a dutiful daughter and had the consent of her parents to the marriage. It was a love match, the parties were of equal worth and there is no ground for the belief that the young man was moved to seek the alliance by sordid motives or by any other impulse than natural affection. Twice the wedding had been postponed on account of the illness of Verline's mother who was confined to her bed by rheumatism. Some time before the important events to which we shall refer, William Forsythe, his bed-ridden wife and Verline had moved from their farm to the nearby town of Tina to live with the Herndons. The defendant Rena Herndon is an elder sister of Verline and her husband was the owner of a livery business in Tina. The two families lived together as one and Rena whom the evidence describes as a woman of positive disposition dominated, to a great extent, the more plastic mind of

her youg sister. The prime object of the family in postponing the marriage was to retain the services of Verline but as an additional reason it was urged that the excitement of a wedding would have an injurious effect on the mother and that it should not occur until her health improved sufficiently for her to bear the excitement without danger of injury. The young couple were anxious to be married and both chafed under their disappointments.

One day Verline accompanied the Herndons on a shopping trip to Carrollton. Ernest became a member of the party by an invitation and at Carrollton went with Verline to a dentist's office where she had some dental work done. The Herndons went about their affairs and the young couple, left to themselves, quickly agreed to be secretly married that day. The evidence, as a whole, negatives the thought that Ernest overpersuaded his bride. One was as willing as the other and out of consideration for the bride's mother, to whom a sudden announcement of the marriage might be injurious, they agreed to keep the fact secret until the following Sunday. (This was Thursday). They procured a license, engaged a clergyman and went to a hotel where they were married. They enjoined secrecy on those who participated in the event and then sought the Herndons and returned home that afternoon. They separated at Tina, Verline going to her home and Ernest to his.

The next day Verline encountered an inquisitive woman who, under pretense of knowing more than she did know, extracted the secret from the less acute girl who assumed that her husband had disclosed it. He had told his father and one or two intimate friends the news, in strictest confidence. The woman, however, had not received knowledge of the secret from this indiscretion but shot an arrow at random and accidentally hit the mark. Verline returned to the bedside of her mother and told her of the marriage. The

mother responded with an outburst of grief. Her crying and sobbing attracted the attention of Rena, who, as soon as she learned the cause of her mother's woe, added fuel to the emotional flame. The father, hearing the tumult, entered and, beholding his wife and eldest daughter locked in a hysterical embrace, demanded the cause and, being told, considered not his wife's health but gave way to angry abuse of Verline and her luckless husband. Then Herndon came in and he, too, joined in the chorus. They charged Verline with cruel thoughtlessness of her mother and with bringing disgrace on the family. There can be no doubt that they poisoned her mind with vindictive and false abuse of her husband. They accused him of marrying her for her money, of persuading her into a disgraceful marriage and of breaking his promise to keep the marriage secret. Afterward Verline was asked by a friend, "Did they give you a licking?" and answered, "No, but they gave me worse."

Early the next morning the married sons of William who were farmers (the defendants Warren and Arthur), came in response to a call for a family council. They, too, arrayed themselves against their young sister. As one of the defendants expressed it, the scene was like a funeral. All treated the girl, who had done what she had a legal and moral right to do, as one who had committed an unpardonable sin and had plunged her family into the deepest disgrace. Asked on cross-examination if he had tried to console his child, the father replied that he had not; that he considered himself the one in need of consolation. The pitiless harshness of the whole family and their blind and unreasoning selfishness are thrown into bold relief by this answer. They had no thought of her welfare, of her future and of her happiness, but thought only of themselves and their fancied disgrace. They forgot she was the lawful and willing wife of a worthy man and that their own selfish concerns afforded them no

just cause for intruding themselves between husband and wife for the purpose of destroying the marital relation. The husband came that morning to see his bride but was driven from the door by abuse from her father.

It is needless to continue the story. Suffice it to say that the defendants and each of them virtually imprisoned the bride, denied her husband access to her and energetically pursued the task of poisoning her mind against him. As the occasions presented themselves she invariably disclosed her love for her husband and her desire to live with him, but she lacked assertiveness and submitted to the domination of her elders. The husband was most persistent in his efforts to obtain his wife but in all the trying scenes through which he passed, conducted himself without show of violence and within the limits of propriety.

The petition alleges that defendants "wrongfully, wickedly and maliciously acted and co-operated together, with the wrongful, wicked and malicious intent to prevent plaintiff's wife from coming to and living with plaintiff as his wife, and to cause her to disregard her marriage vows, and to abandon and desert plaintiff," etc.

Counsel for defendants contend that the evidence fails to accuse them of unjustifiable and malicious conduct, and base their argument upon the rule which gives a parent the right, in good faith, to evince parental affection for his child and natural solicitude for his child's welfare. In answering counsel's argument we are willing, *arguendo,* to accord to the other defendants the same status as that enjoyed by William Forsythe, the father of the bride, and therefore, to treat them all as entitled to any benefit the parental rule conferred upon the father. We had occasion at this term to recognize and enforce this rule (Fronk v. Fronk, not yet reported), and held in that case that a parent, honestly and properly concerned about the

welfare of his married child, might interfere in the marital relations of the child without fear of being punished in damages as long as parental love and not selfishness and malice was the impelling motive. And further we held, in accordance with the great weight of authority, that in cases growing out of alleged malicious interference of the parent, we would begin with the presumption that the parent acted with just cause and in good faith and would impose the burden on the plaintiff of making out a clear case of want of justification. And still further we held, following the recent cases of Barton v. Barton, 119 Mo. App. 507, and Leavell v. Leavell, 122 Mo. App. 654, that where the petition charged a joint tort or conspiracy, the proof of the plaintiff must be of that kind of tort and of no other.

Unlike the Roman law, the common law incorporated in our jurisprudence has established well-defined limits to the right of a parent to interfere in the domestic relations of his married child. As is said in Nichols v. Nichols, 147 Mo. l. c. 400:

"At common law 'the husband is entitled to recover damages in an action on the case against such as persuade the wife to live separate from him without a sufficient cause or against such as take her away either by fraud and persuasion or open violence.' [Blackstone, Book 3, chap. 8, p. 3; Cooley's Ed., s. p. 139.] 'The common law gives him the right to sue for damages, all persons who entice her away, or induce her to live apart from him.' [Schouler's Dom. Rel. (5 Ed.), sec. 41; Cooley on Torts (2 Ed.), p. 262, sec. 2.] And this whether the wrongdoer be the father of the wife, or any other person. [Modisett v. McPike, 74 Mo. 636; Hutcheson v. Peck, 5 Johnston 195.]"

It is the policy of our law to encourage matrimony and to guard the marital relation with jealous care. The state is a party to every marriage contract, is deeply interested in maintaining the dignity and sta-

bility of the marriage relation and will not tolerate even parental interference that is not prompted by true parental love and a disinterested motive to promote the child's welfare and happiness.

The evidence of plaintiff discloses a clear case of want of just cause for the interference of defendants. Verline had married the man of her choice and was willing to perform the obligations and enjoy the blessings of the union. Her husband was worthy of her and his worthiness was acknowledged by defendants. Prompted by false pride and selfishness and in reckless and wanton disregard of the young bride's happiness, they exerted their great influence over her to the uttermost to gratify their own evil passions. Such conduct was excessive and malicious.

We regard as very strong the proof of concerted action on the part of all of the defendants. The evidence is circumstantial but this does not impair its usefulness nor deprive it of potency. "The conspiracy may, of course, be shown by direct evidence, and it is apprehended should be so proved if this character of evidence is attainable. Direct evidence is, however, not indispensable. Circumstantial evidence is competent to prove conspiracy from the very nature of the case and the rule which admits this class of evidence applies equally in civil and criminal cases." [8 Cyc. 677; 91 Mo. App. 500.] We do not agree with the view of defendants that the action must fail because one of the defendants charged in the petition with being one of the joint tort feasors was found by the court to be innocent of the charge and was dismissed from the action. Where several wrongdoers are joined as defendants charged with the same tort, plaintiff may dismiss, at any stage of the proceedings, as to any one of them, without affecting the merit of the action as to the others. [Berkson v. Railway, 144 Mo. 211.] And this for the reason, if for no other, that the failure of proof as to one of three or more

alleged joint tortfeasors does not tend to disprove the fact that a joint tort was committed. The demurrer to the evidence was properly overruled.

Over the objections of defendants the court allowed plaintiff to prove statements his wife made to witnesses other than the defendants and not in the presence of any of the defendants, which statements tended to show the effect produced on the mind of plaintiff's wife by the conduct of defendants. It is argued that such evidence should have been rejected as hearsay but even if this contention be sound we do not believe the error affected or could have affected the jury to the prejudice of defendants. A close analysis of all the evidence, especially the testimony of defendants, convinces us that the issues, to which the evidence in question was addressed, are indisputably resolved in favor of plaintiff by the testimony of the defendants themselves. No reasonable person could read that evidence without having the conviction forced on him that defendants placed the bride under physical and mental duress, denied her husband access to her, and never ceased in their attempts to poison her mind against him. Error to be held prejudicial must relate to a real issue of fact.

But the point may be ruled against defendants on the ground that the evidence was admissible for the purpose of showing the feelings or mental condition of plaintiff's wife and her reason for failing to perform her marriage contract. Recently the precise question here involved was ruled by the Supreme Court adversely to the contention of defendants in the case of Fuller v. Robinson, 230 Mo. l. c. 40, and we refer to that opinion, which reviews the authorities, for a fuller expression of our own views.

A number of objections are urged against the rulings of the court on the instructions but we find them to be without merit. The parties asked too many instructions. Defendants alone asked twenty-seven.

We would have been justified in refusing to examine the errors assigned on the ground that defendants offended against the rule so often pronounced by appellate courts that unnecessarily voluminous and numerous instructions will not be considered but we have waived the rule to the extent of giving thorough consideration to all of the assigned errors. However, we deem them too numerous and too clearly without merit to call for specific discussion and determination. The record is free from substantial error, the judgment clearly is for the right party.

Under all the facts and circumstances of the case as disclosed by the record, we are inclined to regard the judgment of six thousand dollars for compensatory damages only as excessive and think that it should be reduced to four thousand dollars. Therefore, on condition that within ten days from the filing of this opinion the plaintiff shall enter a remittitur of two thousand dollars and all accrued interest the judgment will be affirmed; otherwise it will be reversed and the cause remanded. It is so ordered. All concur.