# MARCH, 1926.

MARY ELIZABETH BELT, RESPONDENT, v. ALEX T. BELT ET AL., APPELLANTS.

Kansas City Court of Appeals.    July 6, 1926.

*Lawson & Hale, Sam Withers, S. J.* and *G. C. Jones* for appellants.

*John T. Morris* and *Guy Whiteman* for respondent.

ARNOLD, J.—This is an action in damages for alienation of the affections of plaintiff's husband. The parties reside at Norborne, Carroll county, Missouri, and defendants Alex T. Belt and Dora Belt are the parents of plaintiff's husband, James C. Belt. The petition charges that the defendants,

"Wrongfully, wantonly, wickedly and maliciously, and intending to injure plaintiff and deprive her of the aid, comfort, support, society, assistance and affections of the said James C. Belt, her hus-

band as aforesaid, for a long period of time prior to the 28th day of January, 1924, conspired, confederated and cooperated together, wrongfully, wantonly, wickedly and maliciously to alienate from plaintiff her said husband, James C. Belt, and did, by conspiring, confederating and cooperating together against the plaintiff, wrongfully, wantonly, wickedly and maliciously, persuade and induce the said James C. Belt, plaintiff's husband, to lose his love and affection for plaintiff and to separate from and abandon plaintiff, thereby alienating and destroying the love and affection of the said James C. Belt for plaintiff, and causing the said James C. Belt to separate from and abandon plaintiff, thereby breaking up and destroying the home of the plaintiff and the said James C. Belt, and thereby depriving plaintiff of the aid, comfort, society, companionship, assistance and affections of her said husband, James C. Belt.

"Plaintiff says that by reason of the premises, the said James C. Belt, husband of plaintiff as aforesaid, separated from and abandoned plaintiff, and that by reason of said wrongful, wanton, wicked and malicious acts and conduct of defendants as aforesaid she has been deprived and still is deprived of the love, affection, aid, comfort, society, companionship and assistance of her said husband, James C. Belt, and that she has been humiliated and disgraced by reason of defendants' said wrongful, wanton, wicked and malicious acts and conduct aforesaid and has suffered great anguish and distress of body and mind."

Actual and punitive damages are asked in the sum of $15,000 and $10,000, respectively.

The defendants, Alex T. Belt and Dora Belt each filed separate answers making general denial. Eldred Houston who was also named as a defendant, filed separate answer consisting of a plea to the jurisdiction of the court on the grounds (1) that she is not, and was not on and before the date of the institution of this action, a resident of Carroll county, and (2) that service on her was in Jackson county, Mo., where she resides; and (3),

"that Alex T. Belt and Dora Belt, the other defendants herein are residents of Carroll county, Missouri, but that neither of said defendants were or are necessary or proper parties herein and are not bona-fide defendants to or for the alleged cause of action, which is based on alleged conspiracy of defendants, for the reason that if there is any liability on the part of defendants, which is denied, it would be a several liability and not a joint liability; that said defendants, Alex T. Belt and Dora Belt, were improperly joined as defendants herein for the purpose of attempting to confer on this court jurisdiction of the person of this defendant and of the subject of this cause."

The reply was a general denial of the matters contained in the separate answers of the defendants. During the progress of the

trial plaintiff dismissed her suit as to defendant Eldred Houston and the cause proceeded to judgment against the remaining defendants. Judgment was rendered for plaintiff against Alex T. Belt and Dora Belt in the sum of $6000 actual damages. Motions for a new trial and in arrest were unavailing and defendants appeal.

The record shows that James C. Belt is the son and only child of defendants Alex T. and Dora Belt, husband and wife; that plaintiff, whose maiden name was Mary Elizabeth Liller, and James C. Belt were married on November 6, 1915, and from that date until January 28, 1924, they lived together as husband and wife; that on said last named date there was a separation, plaintiff remaining in the house which had been occupied by herself and husband for some years immediately preceding the separation. During the first few months of their married life plaintiff and her husband lived at the home of Alex T. Belt and Dora Belt. Later, for some two or three years, they lived in rented houses, until they purchased a home of their own where they lived until the final separation and where plaintiff still resides.

The facts show that on Christmas Day, 1922, a family dinner was given at the home of Alex T. Belt and that plaintiff and her husband, Mary Van Landingham, Catherine Cunningham and her son F. S. Cunningham, were guests. Mrs. Van Landingham and Mrs. Cunningham were sisters of defendant Dora Belt and Mrs. Cunningham lived at Liberty, Missouri. As soon as plaintiff and her husband arrived at the home of the elder Belts, James C. Belt was given intoxicating liquor; that the drinking was repeated until James C. Belt and his father became drunk; that when seated at the table, Alex T. Belt, because of his intoxication, was unable to carve the turkey and asked James C. to perform that function; but being intoxicated, he was unable to carve the fowl satisfactorily; that the face of James C. Belt was flushed and his remarks and condition were those of a man excessively drunk. Plaintiff was so grieved and shocked at the condition of her husband, brought about by the acts of his parents in giving him intoxicants, that she could not eat her dinner but left the table and repaired to the living room where she remained until the meal was over, when her husband came into the room and reclined upon a couch; that plaintiff said to her husband, "O, Jim, how could you have forgotten yourself so?" and that he replied, "O, honey, I didn't mean to do it." Plaintiff then said to him, "I know they ought not to have given it to you." At this juncture defendant Dora Belt came into the room in a state of anger and said to plaintiff: "What's the matter with you? Why did you leave the table? This is the way you always act." This was said in the presence of plaintiff's husband and defendant Alex T. Belt. Thereupon Mrs. Cunningham and Mrs. Van Landingham came into the

room and in their presence and in the presence of James C. and his father, the defendant Dora Belt further said:

"Now, I am going to tell you how Mary Elizabeth always acts. She's a perfect devil, and I have kept in my heart the things that she has done. And now I am going to tell you. This is the way she always acts, and I know and you know, there has nothing been done to make her act like this."

Dora Belt also said at that time that she had been in plaintiff's home (prior to her marriage to James C. Belt) and that plaintiff had a very poor home; that plaintiff had never been accustomed to anything in her home and that what plaintiff now had she (Dora Belt) had given her; that Dora Belt then turned to plaintiff's husband and said, "You know how she quarrels all the time. This is the way she does." She said plaintiff had offended them terribly and would not try to be one of them.

There was testimony in plaintiff's behalf, in this connection, tending to show that defendant Dora Belt felt, and so expressed herself that her son in marrying plaintiff had married beneath his station. That plaintiff replied to this tirade by saying:

"No, Mrs. Belt, it isn't that at all. I don't want to hurt your feelings or do anything to offend you. It's just that I can't bear to have you give whiskey and things to Jim, because I know you both like it, and I know Jim can't help liking it, and it just hurts me so. If this is the way you want to spend your holidays, I don't expect to ever come into your home again on a holiday, because I can't bear it and I can't enter into it."

Further, it appears that Dora Belt said in the presence of the others that plaintiff was just of a high temper and quarrelsome nature and nothing pleased her; that Jim was not drunk and that they were not drunk and hadn't been drinking. Plaintiff denied this and said to her mother-in-law:

"You are trying to make trouble between Jim and I, and you have been doing it. . . . Are you trying to separate us; is that what you are doing?"

Thereupon Dora Belt said: "I don't care what you do; you can go if you want to."

It appears in plaintiff's account of the affair that at this juncture defendant Alex T. Belt, because of his intoxication, was *hors de combat* that he began to cry and was escorted to bed where he became quieter and went to sleep. After Alex T. Belt had been thus disposed of, plaintiff said to her husband:

"Let's don't talk any more about it, I'm all alone . . . Jim, I'm all alone in this, and let's don't have any more trouble about it." and his reply was "all right." Then Jim turned to his mother and said:

"Oh, mama, you have made a barrier between Mary Elizabeth and I that will never be healed, and you have made a barrier between you and Mary that will never be healed. You oughtn't to have said things."

To this, his mother replied:

"Well, Jim, she's acted that way; that is the way she spoils everything. We can't enjoy ourselves because of her. She won't do as we want her to do."

Later in the evening Alex T. Belt was taken for an automobile ride in which plaintiff, her husband, F. S. Cunningham and Mr. Van Landingham participated; that the ride (as was its purpose) was efficacious in restoring Alex T. Belt somewhat to his normal state of sobriety and that it did the same for James C. Belt. Plaintiff testified that after the episode of the Christmas dinner and the strained feeling thereby engendered, the conduct of the elder Belts toward her was never the same as before; that they held a dislike for her and showed it in their attitude toward her; that while there was ostensible cordiality between defendants and plaintiff, the Christmas episode was never entirely forgotten.

About July 1, 1923, plaintiff and her husband and a Dr. Kelsey Houston and his wife Eldred Houston, drove to Colorado together in an automobile. They returned to Norborne, Missouri, about July 29 or 30, 1923. On the trip the party visited various points in Colorado. The entire party used one trunk for economy of space, transporting the necessary clothing and effects of the party in that one trunk which belonged to plaintiff and her husband. It is admitted in evidence that prior to the Colorado trip, there existed a close friendship between the parties thereto. On this trip, among other places, the party visited Estes Park, Colorado. It appears in evidence that the hotel was crowded and the four took one room with two beds, of which plaintiff and her husband occupied one and the Houstons the other. On retiring plaintiff's husband said he was tired and wanted to sleep late, and that the others could get out and not to wake him up. Plaintiff awoke and went out of the room about eight o'clock the next morning. When she returned, Dr. Houston was gone and Mrs. Houston was standing by Jim's bed with her kimona over her night dress and having her hair down. Mrs. Houston said "Oh, we haven't done anything," to which plaintiff replied: "I have not accused you, Mrs. Houston, but I don't know the meaning of your actions."

Mrs. Houston stated she had just come over to awaken Jim because he was talking in his sleep, to which plaintiff replied, "That isn't so."

This evidence was received over the objection of defendants, but was admitted on the ground that it was proper because related by plaintiff on the witness stand in telling what her husband had told

defendant Dora Belt after returning home, and under circumstances which will be related hereafter. On the return from Colorado, the party stopped at Salina, Kansas, where there was another occurrence, the details of which were told by Jim to his mother after the party returned to Norborne, as related by plaintiff on the witness stand, over the objection of defendants. As testified by plaintiff, Jim told his mother:

"That there was a bunch of football people on that floor and the bathtub was very soiled, that they had been bathing, so Mrs. Houston went with me to wash out the tub, and Jim and Doctor were in their room, and then when we had come back to them and told them, and talked about who should come on first and take their bath, and that Mrs. Houston said we should take ours first, and so I went and took mine, and Jim was not quite ready to have his; then I came in the room and said 'You take your things and go and take your bath before anybody else gets in the bathroom,' and he did that, and then he was in there and Mrs. Houston came in there, and they were in there talking, and I had come and Dr. Houston, and I had knocked on the door and came in he said, of course, that Mrs. Houston—that I said she was in there and he said he didn't know where she was and that I went to the window and raised it and raised the blind and she was sitting on the ledge outside of the window, and that I said for her to come in, and when she had done that, we stood there talking for sometime, and that I accused them of misconduct, and that they both said there had been none, and then we went down and her husband also accused her of misconduct."

There was another occurrence which was told by Jim to his mother, as related by plaintiff on the witness stand, as follows:

"Jim then related what happened at Wakeeney, Kansas, saying: 'Told that we had our rooms upstairs and they had their room downstairs, just across from the bathroom, there being no bathroom upstairs, and that night that he went downstairs and came back with his shirt soiled across the front; he said to me, 'Mary Elizabeth, have I a clean night shirt?' and I said 'What's the matter with your night shirt?' and he said, 'Well, it fell on the floor and got soiled and I want a clean one.' Then he said I was suspicious about it and didn't believe him, and went downstairs; then he asked me why I was downstairs snooping around before; he said 'I heard you downstairs when I was down there; what were you doing there snooping around?' and he said that I (of course) said that I had been down to get my gloves that I thought were downstairs either in the bathroom or in Mrs. Houston's room, and that he heard me talking to Mrs. Houston down there, and thought, of course, I was accusing her of misconduct, and then, of course, the nightshirt—he said then

how I had gone back downstairs and told about the dust being disturbed on the top of this railing or the top of the partition.

"Q. Partition where? A. The partition dividing the two bathrooms, and he said, 'Of course, the dust I had gotten on my shirt was off the floor, but he said 'Mary Elizabeth said I got it off the top of that,' and he related how the bath rooms were arranged, the furniture in them.''

Plaintiff's account of what Jim Belt told his mother as to the above described occurrences is corroborated by Mrs. Martha Liller, the mother of plaintiff, who was present at the time.

It appears that in returning from the Colorado trip, the parties passed through Excelsior Springs, where they stopped for a few moments at the home of plaintiff's mother, Mrs. Liller, and then went on to Norborne, where they arrived at about 2 o'clock in the morning. The Houstons went to their own home and plaintiff and her husband stopped at the home of the elder Belts. They were cordially received and were served breakfast the following morning by defendant Dora Belt.

The following day Mrs. Houston went with plaintiff to the home of the latter where their respective belongings were taken from the trunk and divided; they also went to the bank and divided some valuables which had been left for safe-keeping in a common deposit box. After remaining in Norborne for approximately two weeks, plaintiff went to Excelsior Springs, Missouri, to visit her mother and while there told her of the happenings of the Colorado trip. Plaintiff returned to her home and soon thereafter Mrs. Dora Belt went to Liberty, Missouri to visit her sister. During her stay there she was called by telephone by the mother of plaintiff, Mrs. Liller, who then went to Liberty and told Dora Belt of the occurrences on the Colorado trip, as related to her by plaintiff. Whereupon Dora Belt returned to Norborne, arriving about midnight and was met at the train by her husband. They went to their home and spent the remainder of the night talking these matters over. The following morning they went to the home of plaintiff and her husband, arriving before the latter couple had had breakfast. When Mrs. Dora Belt entered the house she displayed deep anger and demanded of plaintiff:

"Why all this fuss I hear you making? What's all this talk I hear you making about the Colorado Trip? I want to know about it."

To which plaintiff replied:

"I would rather Jim would tell you because I know you wouldn't believe me, but he will tell you."

Then, in the presence of her husband and son, plaintiff's husband, Dora Belt stated:

"I don't believe Jim has done any wrong. I don't believe anything that I have heard. Your mother has come over to Liberty

and taken me away from my sick sister, and accused Jim of all sorts of things and that you have made all sorts—told all sorts of stories; I don't believe a word of it. She just came over there and 'raised Cain' about it, and I want to know what all this fuss is about.''

Again plaintiff stated she would rather Jim told her because she would believe Jim and not plaintiff. Shortly thereafter plaintiff's mother arrived from Excelsior Springs and Jim and his father came to plaintiff's home. Plaintiff, her husband, Alex T. and Dora Belt and Mrs. Liller ate the noon meal there. Soon after the meal was finished, Alex T. Belt went to the furniture store which he and his son Jim owned, but before going he told his son he need not hurry about coming back to the store. Jim then told his mother and his mother-in-law the account of the Colorado trip. After this relation, as testified to by plaintiff, defendant Dora Belt said to her son:

''Jim, I know you have not done any wrong and I am going to be nice to Mrs. Houston. I don't know anything on her or against her and I am going to be nice to her. . . . Mrs. Liller, you can take your daughter and go home with her, we Belts are through with her.''

Then, she turned to plaintiff and said:

''You have been a perfect devil ever since you have been in our family and you can get out.''

And to Jim, she said: ''She's told this all over town, and people are talking about it, and she's told it.''

Then to plaintiff:

''You don't come of a good family and you have been poor and your parents were poor. I have been in your home and I saw the way you lived, and at that Christmas dinner, you spoiled everything.''

Plaintiff then determined to call a Mrs. Guy Whiteman to disprove a statement made by Dora Belt and Jim that plaintiff had told Mrs. Whiteman about the Colorado trip. Thereupon Jim asked his mother to leave. Mrs. Whiteman came and denied that plaintiff had told her anything about the Colorado trip.

After these occurrences, the relations between the two Belt families seem to have been cordial. They visited back and forth, had meals together and associated together without further outbreaks until Labor Day, 1923. In the afternoon of that day, the two Belt families went to Bowdry Lake to attend a picnic, going together in an automobile. While there, Dr. Houston and his wife arrived and were received cordially by the elder Belts. But plaintiff refused to associate with Mrs. Houston, in accordance with a determination to that effect previously expressed to the Belts. It is in evidence that on two or three other occasions that afternoon Dora Belt and her husband, in company with Mrs. Houston, brought the latter into the

presence of plaintiff in an apparent effort to force plaintiff to acknowledge Mrs. Houston, but were unsuccessful. The Belt families returned to Norborne for supper and went back to the picnic grounds for a dance that evening. The same effort was put forth in the evening on the part of the elder Belts to force plaintiff publicly to acknowledge Mrs. Houston, but without success.

It is in evidence that within a day or two after the Lake Bowdry incident, plaintiff went into the furniture store owned by the Belts and was greeted by Alex T. Belt with the query, "What are you going to do about Mrs. Houston?" to which plaintiff replied, "I am not going to have anything further to do with Mrs. Houston. I am through with her." Mr. Belt then said, "You have got to be nice to Mrs. Houston; you have got to treat her as you have always treated her." Plaintiff replied,

"Mr. Belt, I will not receive that woman any longer in my home and I will not be seen with her, and I will not be a party to this affair any longer."

Whereupon the senior Belt said: "You have got to do it, or get out." Plaintiff's reply was: "I will not have anything to do with her, Mr. Belt, I can't. That's too much to ask of any woman and I can't have anything further to do with her. . . . I have never associated with indecent people and I shan't begin now."

Shortly after the talk at the store between plaintiff and Alex T. Belt, and also after an acrimonious meeting of plaintiff, her husband and Mrs. Houston at Dr. Houston's office over the situation, about one o'clock in the morning when plaintiff and her husband were in bed and asleep, the telephone rang and plaintiff answered it. It was Dr. Houston wanting to talk to Jim. Jim went to the telephone and said "I'll be right up," and then, turning to plaintiff, said, "Dr. Houston wants me," and immediately left the house, leaving plaintiff alone. After a little while Jim returned with Dr. Houston and a few minutes later Alex T. Belt came in. The four of them being present Dr. Houston said that plaintiff's brother Harry Liller of Excelsior Springs had called the Houstons and threatened them and frightened them terribly and that was the reason he had called Jim to his home. Dr. Houston then threatened to sue plaintiff for slander and Alex T. Belt remarked,

"That's the thing to do, so she will keep her mouth shut; that's the thing to do. . . . We Belts are done with her, she can get out, she can leave. I don't know what she's waiting there for. . . . The Belts are done with you; that will shut her mouth. The Belts are done with you. She can get out."

Plaintiff replied, "I am not going to leave Jim, Mr. Belt." To which Alex T. Belt replied, "Well, the Belts are done with you, you can get out." Dr. Houston again said he was going to sue plaintiff for slander, and Alex T. Belt again said, "That's the right

thing to do." Then, for the first time, Jim spoke in plaintiff's defense, saying:

"Well, unless Mary Elizabeth tells any lies, you can't do anything to her, and we four know what happened on the trip, and I am not going up there and perjure myself in the court. . . . If that's what you are trying to do, I am not going into court and perjure myself . . . unless she lies you can't do anything with her."

Plaintiff further testified regarding this occurrence:

"So then Mr. Belt said 'Jim I came down to get your gun and if that—

"Q. Go ahead and say. A. I can't. I don't want to use that expression. I am using a very ugly term about my brother. 'If he comes down here, I will be ready for him,' and so it happened that Jim had Mr. Belt's shotgun there and it was brought into the room then.

"Q. Who brought it in? A. Well, I think Jim told me to get it, and I believed I brought it in, and it sat there against the edge of the door, and then Dr. Houston said he wanted the gun, and Jim remarked that he only had the automatic that he had . . .

"Q. Then how many guns were there in the house? A. One laying on the dresser in my room and then the one that was standing there in the living room, and then I said, 'I just can't stand any more of this, and if that's all you have to say to me, if you are just going to try to intimidate me and beat my story out of me, and the things that I have told Jim and told you all is true, you can't do it; if you want to sue me, that's all right, but you can't any of you intimidate me,' and I says, 'If I must face those things, I will face it before just people and not before people that try to twist everything that I say.

"Q. By the way, what's your weight? A. About a hundred. (Objection.)

"Q. Alex T. Belt, what's his weight? A. Oh, he weighs two hundred, I should say.

"Q. Dr. Houston? A. He's a good sized man. He weighed 165 I think when we were on our trip, something near that.

"Q. Was there any other woman in the house besides you? A. Oh, no. And then I went back in the bed room. They shouted back after me: 'Have you got anything else to say?' And I said 'No.'

"Q. Who shouted? A. Well, Mr. Belt called out once and then Dr. Houston. Jim didn't say anything to me at that time.

"Q. In what manner did Mr. Belt say that to you, or shout? A. Well, of course, they were both angry with me.

"Q. How did you know that? A. By the tone of voice and the way they had acted and the way they walked about in my living room. I was sitting on the davenport and they were walking about

all the time and had come up to me several times. Mr. Belt and Dr. Houston said 'You have got to keep your mouth shut, and you have got to leave' and different things, and then I went back into the bed room and when they asked me if I had anything else to say, I said 'No, nothing, there isn't anything else to say,' and then they left, all of them again.

"Q. Who left? A. All the three.

. . . . . .

"A. Well, then after a time Jim and Mr. Belt came back, and they came back into my bedroom where I was lying on the bed, and Mr. Belt said, 'What are you going to do about this?'

"Q. Who said that? A. Mr. Belt, and I said, 'Why, I can do nothing, I don't know what you want me to do,' (witness crying) and he said 'I want you to keep your mouth shut and go on treating Mrs. Houston nice and behave yourself.' And I said 'I don't know what I have done,' and I said 'I can't receive Mrs. Houston in my home and you mustn't ask it,' and then Mr. Belt got up and stood at the foot of the bed and leaned over and said to me, 'You are just like (crying) your old mammy. She acted so terrible that she made your father kill himself.' And I said to Mr. Belt, 'Don't say that,' and Jim said: 'Oh, papa, you mustn't say things like that, that isn't true,' and then, of course, I cried and Mr. Belt then got up and went back into the living room, and after a few minutes I went in and I said: 'Now, Mr. Belt, I beg that you let Jim and I settle this thing between us. We have always had interference between us with both of you, and I beg that in this you let us settle this ourselves because it means our happiness, and if you won't, that you will just keep out,' (witness crying), and then Mr. Belt begged Jim to go home with him and leave me there alone, and Jim finally said, 'No, I won't go, papa, you go on home,' and then when I went on back and when Jim came into the bedroom, he said: 'Honey, I didn't want to leave you,' and I said, 'No, I know you don't, and if we were let alone we could get over this affair, but we mustn't lose in this, we must fight this thing out just we two because it's just our affair' . . .''

Plaintiff testified that after the scene just related there was a marked difference in her husband's conduct towards her. Her testimony in this respect is as follows:

"Q. What was the difference? A. Yes, there certaintly was a difference, always.

"Q. How's that? A. There was always a difference when he was with his people.

"Q. What was the difference? A. Well, when he would stop there and talk with them for any length of time, then when he came home he had nothing to say to me. He was morose and he just had nothing to say to me.

"Q. Well, and then after he was away from them for awhile, state whether or not there would be any change? A. There was, because when he came back from the Chicago trip, he had been away some days, he seemed quite happy to be at home, and would tell me about the different things he had seen on his trip to Chicago, and seemed quite like himself.

"Q. After he came back from Chicago, did he go to see his parents again? A. Yes.

"Q. When he came back? A. The same thing over and over.

"Q. What do you mean? A. There was always a change. As soon as he was with his people again, he grew very different to me."

It is shown in evidence that Alex T. Belt and plaintiff's husband sold their furniture business and Jim secured a position as traveling salesman for a Chicago furniture house. He was then away from Norborne on business of his firm a considerable part of his time. He would return to Norborne at intervals of approximately two weeks, living at home with plaintiff but spending much time with his parents. On returning to his wife from these visits he would show an attitude of indifference toward her. In the meantime, and after the midnight scene at plaintiff's home, above related, social visits between plaintiff and the elder Belts entirely ceased, owing to the strained relations existing.

The final chapter in this domestic tragedy was written on January 28, 1924. On Sunday, January 27, 1924, plaintiff's husband was at home making out his route sheet and among other places he was to visit, Kansas City, Missouri, was listed for Monday the 28th. On Monday morning, Jim got up early to go to Kansas City, and kissed plaintiff good-bye. Being suspicious that Mrs. Houston was going to Kansas City on the same train, plaintiff went to the railroad station and saw Mrs. Houston and Jim board the same train. Because of her suspicions, plaintiff telephoned to her brother, Harry Liller, at Excelsior Springs, on Sunday night, January 27th, asking him to meet the early morning trains from Norborne at the Kansas City union station. Harry Liller did this and called to his aid a private detective, Antone Mouritzen. Mrs. Houston and Jim arrived at Kansas City on the same train, took a taxicab to the Abbott Hotel in said city and registered under an assumed name as "Mr. and Mrs. J. O. Brown, Chicago." They were followed and observed by detective Mouritzen. Jim and Mrs. Houston took their baggage to the hotel and together occupied room numbered 300, as Mr. and Mrs. J. O. Brown.

The final result of this episode was that James C. Belt never thereafter returned to plaintiff.

It is urged the court erred in refusing to give defendants' peremptory instruction "A" in the nature of a demurrer, to find for the defendants Alex T. and Dora Belt, at the close of all the evi-

dence. In support of this charge it is argued there is no evidence of record which would authorize the submission of the case to the jury. We think it will not be necessary to repeat the rule that in the consideration of a demurrer, the evidence in behalf of plaintiff must be taken as true and all reasonable deductions therefrom be made in favor of the cause of action. Without going into detail as to the evidence introduced in behalf of defendants, it is sufficient to say that it was flatly contradictory of plaintiff's evidence in many particulars, affecting the merits of the case. Yet we must consider this charge of error in the light of the rule applicable to a demurrer. [Surbeck v. Surbeck, 208 S. W. 645.]

It is urged by defendants that the petition charges conspiracy and that none was shown. Conspiracy has been variously defined, and it is not our purpose, nor is it necessary for us to consider and analyze the numerous definitions. One will suffice:

"A combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." [1 Bouvier's Law Dict., p. 621.]

This is the definition generally accepted. [Pettibone v. U. S., 148 U. S. 197.] Conspiracy may be shown by circumstantial evidence. [Mosby v. Commission Co., 91 Mo. App. 500; 8 Cyc. 677 et seq.] In the Mosby case it was held, in effect, that it is not required to establish conspiracy by direct evidence; that where the facts in evidence justify a reasonable inference of the existence of a conspiracy, it is sufficient; that slight evidence of collusion or concert of action will suffice; that while there must be, at least, some evidence of collusion, still the same may be inferred from the acts of the parties and the surrounding circumstances. [See also Allen v. Forsythe, 160 Mo. App. 262, 269; Laytham v. Agnew, 70 Mo. 48; Weinstein v. Reid, 25 Mo. App. 41.]

The testimony in plaintiff's behalf, as above detailed, tends to show that from a time soon after the return of the party from the Colorado trip, defendants knew of the relations between plaintiff's husband and Mrs. Houston; and yet, by inference, there is shown an attempt on the part of these defendants to compel plaintiff to associate with Mrs. Houston, and the jury seems to have so construed the evidence.

Plaintiff's evidence tends to show that there was such a concert of action by defendants, from which the jury might find the existence of a conspiracy to compel plaintiff to acknowledge Mrs. Houston socially, or to separate plaintiff from her husband. There was, therefore, no error in the action of the court in refusing the peremptory instruction in the nature of a demurrer. This ruling also disposes of defendants' assignments of error numbered 2 and 3, which relate to instructions offered in the nature of demurrers.

It is charged the court erred in giving plaintiff's instruction No. 2. The objection to this instruction is general and to the effect that there was no evidence upon which to base it, and that it allowed the jury to determine the law in the case. This instruction tells the jury that in order for plaintiff to maintain this action, it is not necessary that she should prove by the evidence in the case that defendants directly requested plaintiff's husband to leave her, or to remain apart from her, but if the jury believes from the evidence that defendant Alex T. Belt and Dora Belt conspired and acted in concert and cooperated together, and were wilfully and maliciously guilty of such conduct as was calculated to prejudice plaintiff's husband against her and to alienate him from her, and to induce him to leave her and remain apart from her, and that such effect was wilfully and maliciously intended by said defendants to be produced by their conduct, then the jury should find for plaintiff. What we have already said in passing upon the first assignment of error also disposes of the contention in respect to alleged error in this instruction, as well as to the objection to plaintiff's instruction No. 1½.

It is charged, further, that the court erred in giving plaintiff's instruction No. 3, for the reasons (1) that it referred the jury to the petition for the issues; (2) that it authorized the jury to determine the law in the case; and (3) that it was a comment on the evidence. The instruction complained of reads as follows:

"The court instructs the jury that the existence of a common purpose or design, or conspiracy, as used in these instructions, need not be proved by direct and positive evidence, but like any other fact may be established by facts and circumstances. In determining whether or not defendants were guilty of the acts and conduct complained of in plaintiff's petition, and in determining whether or not such acts, if done, were done in pursuance of a common purpose, design or agreement between defendants, the jury may take into consideration the circumstances, situation and relationship which existed between the parties, their conduct and acts, as well as any open or affirmative declarations, if any, indicative of such common purpose, design or agreement, together with all of the other facts and circumstances in evidence."

The offending clause in the instruction is as follows:

"In determining whether or not defendants were guilty of the acts and conduct complained of in plaintiff's petition, and in determining whether or not such acts, if done, were done in pursuance of a common purpose," etc.

The practice of making reference to the pleadings for the issues in instructions has been condemned by the Supreme Court, and in the case of Britton v. St. Louis, 120 Mo. App. 437, 445, it is said:

"We recognize and approve the rule of practice that the jury must not be left to the pleadings to ascertain the issues," etc.

The reason for the rule is obvious. In practice, certain charges of negligence in the petition are often abandoned at the trial and, more frequently, charges are made which are unsupported by evidence. However, in the case at bar it is not charged that the instruction complained of assumes to cover the entire case and directs a verdict; in which event to refer to the petition for essential facts upon which the right to recover is predicated, is reversible error. But this rule does not obtain where the allegations are no broader than the proofs (Remmler v. Shenuit, 15 Mo. App. 192), for the reason that in such a case the reference to the petition cannot be said to have enlarged the cause presented by the evidence. It must be held, therefore, that unless the petition has the effect of broadening the evidentiary issues, such reference thereto may not be classed as prejudicial and therefore not reversible error, although it is a practice likely to mislead the jury and should be avoided.

It must be noted that the allegations of the petition herein are general, not specific, and no allegations are made which are not adequately supported by the evidence. There is no discrepancy between the allegations and the proof. The one is no broader than the other, and an instruction which refers to the petition for the facts would necessarily mean the same as one which refers only to the evidence. The use of the words complained of in plaintiff's instruction neither added to nor took from the stated hypotheses and was not prejudicial. [McKay v. McKay, 192 Mo. App. 221; State v. Scott, 109 Mo. l. c. 231; Hartpence v. Rogers, 143 Mo. l. c. 633; Britton v. St. Louis, 120 Mo. 437.] Defendant's citations do not change this rule.

It may be further noted that defendants' instructions numbered 18 and 19 which were given by the court are chargeable with the same fault as is lodged against plaintiff's instruction No. 3. Defendants, therefore, are in no position to complain.

It is charged the court erred in giving plaintiff's instruction No 4, as follows:

"Although the jury may believe from the evidence that the conduct of plaintiff's husband toward her afforded her sufficient grounds for obtaining a divorce from him, and yet if the jury further believe from the evidence that notwithstanding such misconduct on part of plaintiff's husband, plaintiff was still willing to live with him, and her husband would not have separated and remained apart from her if it had not been for the willful and malicious acts and conduct and influence of said defendants toward him, and that said defendants willfully and maliciously by such acts and conduct and influence, induced, enticed and caused him to separate and remain apart from plaintiff, then the fact of the misconduct of plaintiff's husband toward her does not of itself constitute any defense to this suit."

The objections to this instruction are (a) that it was a roving commission to the jury to determine the law; (b) that it assumed certain disputed facts; (c) that there is no evidence upon which to base it.

As to the first of these objections, we find almost a counterpart of this situation in the case of Modisett v. McPike, 74 Mo. 636. It was held in that case that in an action by the husband for alienation of his wife's affections, thereby inducing her to separate from him and to sue for and obtain a divorce, that evidence of defendant's conduct would be competent as pertaining to the material inquiry, whether such conduct was actuated by proper or improper motives. An instruction in that case essentially in the same form as the one complained of herein was approved by the court. The rule therein stated is the law in this State and defendant's citations are found, on examination, not to be to the contrary.

It is true, the instruction does not define what would be "sufficient grounds for divorce." Defendants' position during the trial was that whatever trouble arose between plaintiff and her husband and which led to the separation, had its origin and culmination in the relations which sprung up and were carried on between plaintiff's husband and Mrs. Houston, unknown to defendants and for which they were in no way responsible, so that the point of the conduct of plaintiff's husband was made by defendants. We think it was not necessary to define in the instruction what would be "sufficient grounds for divorce." The remainder of the instruction fully covers the situation and there are no grounds for a conclusion that the instruction was prejudicial, that it assumes as true facts which were in dispute, or that there was no evidence upon which to base the instruction.

It is charged that instruction No. 5 is erroneous because "there is no evidence affording any direct proof, nor from which it can reasonably be inferred that defendants prejudiced plaintiff's husband against her; nor is there any evidence that aside from said conduct and influence he would not have left her." It is not within the province of this court to pass upon the weight of the evidence and we shall not do so, and need only say there was substantial evidence to support the instruction and that it is clearly within the scope of the evidence. The same observation may be applied to defendants' charge of error in plaintiff's instruction No. 9. There was ample evidence to form a basis for the instruction.

It is charged that plaintiff's instructions 1½ and 12 are erroneous because they give the maximum amount which the plaintiff may recover. Defendants admit they are "well aware of the fact that it has often been decided that it is not error to tell the jury in one instruction the maximum amount of recovery." But it is insisted that in repeating the amount in two instructions, the point has been

unduly emphasized. We see no prejudicial error in this respect because the emphasis is as strongly in defendants' favor as plaintiff's. This point needs no further discussion.

It is charged the court erred in refusing defendant's instruction "E" which sought to withdraw from the consideration of the jury evidence of what took place at the Christmas dinner in 1922, the contention being that the events referred to were too remote in time, being more than a year before the final separation. We think this objection untenable because, as the testimony tends to show, there was from that time forth an estranged feeling between plaintiff and defendants. This was refuted but the evidence was for the jury to consider and the instruction of defendants was properly refused. This ruling also applies to defendants' refused instructions "D" and "G" which sought to withdraw from the consideration of the jury the occurrences at Bowdry Lake. A charge of error is based upon the refusal of the court to give defendants' instructions "H," "I" and "J", but we find their refusal was proper for the reasons applicable to instruction "G" already stated.

It is also charged the court erred in admitting evidence of what occurred on the occasion of plaintiff's visit to Doctor Houston's office. The record shows this evidence was admitted to show the state of affection of James C. Belt for Doctor Houston's wife and that in the face of this feeling which was known to defendants, they insisted that plaintiff must associate with Mrs. Houston and recognize her socially. For this purpose the evidence was properly admitted.

Defendants charge error in the admission of evidence (1) of the conversation between plaintiff's mother, Mrs. Liller, and defendant Dora Belt at Liberty, Missouri, when defendant Alex T. Belt was not present; (2) as to the conversation between the same parties on the following day at Norborne; (3) as to what plaintiff saw and observed between her husband and Mrs. Houston at a restaurant in Norborne, neither of the defendants being present; and (4) as to conversation that took place at plaintiff's home at one o'clock at night when defendant Dora Belt was not present.

The testimony as to these conversations was admitted upon the theory that a conspiracy was shown between defendants, that the defendants knew of the relations of James C. Belt and Mrs. Houston and yet insisted upon plaintiff's continuing association and social recognition of Mrs. Houston. This evidence went to the very basis of plaintiff's cause of action and the admission thereof was not error.

Finally, it is charged the verdict is excessive. We think we need not discuss this point further than to say the question of the amount of damages to be awarded is for the jury. [Fuller v. Robinson, 230 Mo. 24, 54; Allen v. Forsythe, 160 Mo. App. 262; Surbeck v. Surbeck, 208 S. W. 645.] In cases of this character there is no scale by which damages may be graduated, and no other test than the intelligence

and sense of justice of the jury. [Minter v. Bradstreet Co., 174 Mo. 444.] We find no reversible error of record. The judgment is affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.