GEORGE W. BECKLER v. BEN A. YATES and WALTER M. REED, Appellants.—89 S. W. (2d) 650.

Division Two, January 4, 1936.

*Scott J. Miller* and *Roger S. Miller* for appellants.

*Taylor & Taylor* for respondent.

TIPTON, P. J.—The respondent, George W. Beckler, sued the ap--

pellant, Ben A. Yates, and the defendant, Walter M. Reed, for damages for alienating the affection of respondent's wife. He recovered a judgment for $15,000 against both Yates and Reed. Only the appellant, Yates, has appealed from that judgment.

Appellant contends that his instruction in the nature of a demurrer offered at the close of all the evidence should have been given. In determining the sufficiency of the evidence, we will state only the facts most favorable to respondent.

On July 4, 1924, the respondent married the daughter of the appellant. Her name was Helen. Both had been previously married. Respondent had two children by a former marriage. He had for many years been connected with the Chillicothe Business College. In 1925, there was a fire at this college, and many student tuition notes that were in the school safe had been burned or charred. The school employed defendant Reed to make photostatic copies of these notes. He was a Burns detective. In order that this work be done in a quiet place, the respondent took the records of the school to his home on Calhoun Street, in Chillicothe, and put Reed in charge of the work. The wife of respondent objected to this work being done at their home. This work was done during the summer of 1925. The evidence showed that while working at respondent's home, the defendant Reed, was in many ways more or less familiar with respondent's wife. For instance, when he would go to the kitchen for a drink of water he would be friendly with her and on one occasion, in the presence of respondent, he stated he did not see why a woman as good looking as she should have married the respondent, then he caressed her.

In the spring of 1926, the respondent, his wife and the defendant Reed drove to Trenton, Missouri, and while there went to a shoe store run by respondent's son-in-law and while the respondent was absent Reed became familiar with Mrs. Beckler, "patted her on the bottom" and kissed her. This incident was told to the respondent by his son-in-law. Notwithstanding this information and other evidence of friendliness exhibited by defendant Reed, the respondent testified that he did not lose confidence in his wife until he discovered a series of letters written by Reed shortly before he and his wife separated. The first letter was written by Reed in February, 1926, and these letters continued until May, 1930. The earlier letters were addressed to both respondent and his wife, while the later ones were addressed to her. There is no evidence that she ever answered any of them, but in many of them he did give an address as to where he could receive an answer.

At the time of the marriage of respondent, Yates lived at Pattonsburg, Missouri, and continued to live there until about February, 1929, when he went to live with his daughter and the respondent at

Chillicothe. In the summer of 1928, the appellant's wife died. For several weeks prior to her death respondent's wife was at the home of her parents helping take care of her mother. After her mother's death she stayed with her father until after he sold his home and store. Nearly every week end the respondent went to Pattonsburg and visited his wife. There is no evidence that the appellant Yates objected to these visits. However, the respondent testified that the appellant did object to his daughter returning to her home with respondent. Appellant stated that he needed her and did not want her to leave him. On one occasion the respondent testified that appellant said he was going to keep Helen and after he sold his business he and Helen were going to California and if they liked it out there they were going to stay. Respondent also testified that after this conversation he and his wife went into a bedroom and a short time thereafter the appellant came in and found his daughter crying and he asked her the reason and she said, "You know what's the matter, you separated me and Gib (her first husband) and now you are going to separate me and George."

As previously stated the appellant and his daughter came to Chillicothe and lived with the respondent from February, 1929, until respondent and his wife separated in July, 1930. The fact that the appellant came to live with respondent and his wife was satisfactory to the respondent. In fact, the record shows that the respondent testified that appellant came to live with them soon after he sold his house and store in Pattonsburg that "they lived happily together and the having of Mr. Yates in the home was very satisfactory to plaintiff and that the plaintiff had no trouble whatever with his wife or no disputes of any amount, but did have some disquieting arguments as plaintiff states usually happened to married couples. That the plaintiff after they moved down to the house on Jackson Street lived in the usual way. That he saw nothing out of Mr. Yates that was out of the ordinary; that he was friendly and of course, seemed to love his daughter, plaintiff's wife, very devotedly. He was a man of seventy-seven years of age." While appellant was living with respondent and his wife they purchased a home on Jackson Street and the appellant advanced $5000 towards the purchase price.

The evidence shows that the appellant had never met nor heard of defendant Reed, until after he went to live in Chillicothe and then only met him twice. The first time he met the defendant was at the home of the respondent; at that time the defendant took a picture of the appellant with an old gun that was a Civil War relic. The next time appellant saw the defendant Reed, was in May, 1930, when the appellant and his daughter drove the defendant to Trenton so he could take a train to Kansas City that afternoon. On this trip there

had been, apparently, some discussion about respondent's wife securing a divorce.

Respondent testified that in June, 1930, he had a conversation with his wife and appellant and his wife said, "You did not give me a definite answer to what we were talking about the other day and that you had better accept the offer because I am going to divorce you," and Mr. Yates, the appellant, said, "No, you had better get along." "This was the first information I had and my wife made me the proposition, 'If you will give me the two properties and the brown car I will pay you $2,000.00,' and I told her she could get a divorce if she wanted to, if she had grounds against me. I asked where she would get the money and she said she could borrow it from Dad, I asked Mr. Yates if he would lend her the money and he said, 'Yes, if she wants it, if you can't get along together.'" The respondent further testified that the appellant said he wanted to "bring this thing to a conclusion."

Respondent testified that one night in May, 1930, he returned home and his wife opened the door for him. The appellant was then in bed. Shortly respondent heard the garage door open and looked out the window, he saw Reed crouched in the driveway. Respondent spoke to his wife about it just as the appellant entered the room and the appellant said, "what difference does it make to you if Reed was here?" To which respondent said: "I have told Helen time and time again that I did not want that man on the place." However, the respondent admitted that he had never told the defendant Reed that he did not want him on the place.

Respondent also testified that when he discovered the letters from defendant Reed, the appellant Yates stated he was responsible for the letters being written.

A letter from Reed dated May 7, 1930, contains the following:

"Kansas City, Mo. 5/7/30.

"Dear Helen:—

"Returned, 5/5/30—located my man in Ketchecan, Alaska; now it's up to the other fellow.

"Excuse the 'office talk,' but, I believe you are interested in some matters that *might* be near home. 'The man' from our office, who I met, while there, has returned to K. Cy. and while he admits nothing positive, I am of the opinion that Maurice suspects a local character of participation in the Morehead bank robbery.

"It might not be foreign to his deductions that the 'barber-lunch' man may have some knowledge of the matter. 'A word to the wise' & c. Wish you and Daddy could fully realize how enjoyed my visit even if the subjects of parts of our conversation had to do with a most detestable person and I want you both to know that I shall not be happy till I know you are free from him forever, and I'm sure

you will be able to force matters so that he will willingly fail to contest.

"As usual, I have no idea how long I will be in town, but if I am assigned on any matter that will be of any duration, I will give you an address where I can be reached.

"Have arranged with William Ryle at the Grand Billiard Parlor, S. W. Cor. 12th & McGee Street to take care of any mail addressed to me, he is an old and trusted friend.

"I told the 'folks' of my visit with you & Daddy, and related some of the indignities practiced by G. I did not, however, mention our drive to Trenton. This is just a 'practical' letter, but there are large spaces between the lines. Am anticipating an early reply. Remember what I have so often told you.

"Dad."

Respondent testified that his wife would pinch herself causing black and blue places on her body and show them to the neighbors and tell them that respondent hit her. She testified that he did strike her which caused these marks on her body. He admits that on one occasion in May, 1930, he did hit her with his belt as he was dressing for a party, but claims that it was accidental. She denied it was accidental, and both testified that she and her father went to the party and respondent came later.

■ The respondent's petition alleged that there was a conspiracy between the appellant and the defendant Reed to alienate the affection, and contends that as the evidence fails to show any such conspiracy his demurrer to the evidence should have been sustained. In the case of Miller v. Busey, 186 S. W. 983, we ruled against the appellant's contention and held in a case of this nature: "A recovery may be had against all such and as many tort-feasors as are shown to be guilty."

■ The appellant in this case is the father of respondent's wife. If he were honestly and properly concerned about the welfare of his daughter, he might interfere in her marital relations without fear of being punished in damages as long as parental love and not selfishness and malice was the impelling motive. [Allen v. Forsythe, 160 Mo. App. 262, 142 S. W. 820; Leavell v. Leavell, 122 Mo. App. 654, 99 S. W. 460; Howard v. Boyle, 335 Mo. 435, 73 S. W. (2d) 228; Barton v. Barton, 119 Mo. App. 507, 1. c. 538, 94 S. W. 574.] In cases growing out of alleged malicious interference of a parent, we begin with the presumption that the parent acted with just cause and in good faith and would impose the burden on the plaintiff of making out a clear case of want of justification. [Allen v. Forsythe, supra.]

■ Malice as known to the law is a wrongful act done intentionally without just cause or excuse. It is not merely doing an act intentional-

ly which is wrongful, but it must have been known to be wrongful. [Leavel v. Leavel, supra.] "It has been determined by an eminent court that if a parent believes there is good reason for advising his child regarding the latter's conjugal affairs, the parent is warranted in interfering, even though, in fact no cause existed. [Bennett v. Smith, supra.]" [Barton v. Barton, supra.]

Therefore, to make a case against this appellant the evidence must not only show that he did the acts which respondent insists caused the alienation of his wife's affection for him, but it must show that appellant knew the acts were wrongful and done for the purpose charged. This we think the evidence fails to show.

In regard to the time that the appellant lived at Pattonsburg, even if the evidence could be construed that appellant tried to separate his daughter and respondent he failed to do so as they later lived in Chillicothe as wife and husband.

If appellant did tell the respondent that he did not want Helen to go back to Chillicothe with him, we do not think this is any evidence of his trying to alienate the affection of respondent's wife. The appellant was a man of seventy-seven years of age, who had just lost his wife. Under these circumstances it was only natural for him to want his daughter with him. The respondent was always welcome to visit appellant and his daughter. The evidence fails to show that the affection Helen had for her husband was in any way diminished while she was visiting her father at Pattonsburg. In fact the respondent so testified. On cross-examination the record shows he testified as follows: "All the talk about going to California, and if they liked it they would stay there, I knew that this would not happen and never took it seriously and it did not happen but did come home and lived contentedly, all three of us together. And I do not know that Mr. Yates ever said a word about Helen coming back while they lived in Pattonsburg. She stayed in Pattonsburg with her father and I was up there usually once a week to visit her; it was all right with me."

The evidence clearly shows that the appellant did not know the defendant Reed until after he moved to Chillicothe to live with the respondent and then only met him on two occasions, one when he had his picture taken with an old gun and the other time when the appellant and his daughter drove the defendant Reed to Trenton shortly before the respondent and his wife separated. We find nothing in the evidence that would slightly suggest that the appellant aided the defendant Reed, unless it be the testimony of the respondent that the appellant said he was responsible for Reed writing the letters. We do not attach any significance to the statement because the appellant could not have been responsible for Reed writing them as most of them were written before the appellant ever met Reed, in

fact before he even knew there was such a man as Reed. If the appellant made such statement it was during a quarrel between the respondent and his wife, and to pacify them he was willing to take the blame. Nor is there any evidence that the appellant knew Reed was in the driveway the time respondent testified he saw him there, so no significance could be attached to that incident.

In fact, as above stated, the respondent testified that ''he saw nothing out of Mr. Yates that was out of the ordinary; he was friendly, kind, and of course, seemed to love his daughter, plaintiff's wife, very devotedly.'' If the appellant took sides with his daughter during a family quarrel, it was no more than natural, and this in no way would make him responsible to respondent in damage if he and his wife later separated. The record is absolutely barren of any fact that would tend to show that the appellant in any way aided Reed in trying to debauch his daughter. There was no evidence to show that appellant was responsible for the letter of May 7, 1930, written by Reed. But we may assume that on the trip to Trenton, the question of appellant's daughter securing a divorce was discussed, yet there is no evidence that the appellant advised such course. If he had, the law will presume that he did so in good faith and there is no evidence to the contrary. If the appellant were willing to advance $2000 to his daughter for the purpose of making a property settlement between the respondent and his wife it does not show that the appellant was active in causing the separation. The evidence shows that the appellant stated if they could not get along he would lend her this sum of money. The evidence also shows that the respondent and his wife frequently quarreled and under these circumstances it would have been proper for the appellant to have advised his daughter to separate from her husband. We cannot say that he did not have good reason for believing his daughter would be better off if she did separate from her husband. If he did he would be justified in so advising her. While there is no direct evidence that the appellant advised his daughter about a separation, yet there is evidence that an inference may be drawn to the effect that they had discussed such a proceeding. The record is silent on the advice that the appellant gave his daughter about securing a divorce. He may have encouraged it, he may not. We think the evidence fails to show that the appellant acted in bad faith in discussing with his daughter the possibility of a divorce. We find nothing in the evidence that would show that the appellant caused the separation. Before the appellant would be required to respond in damages the evidence must show that the appellant maliciously caused the wife to lose her affection for the respondent. This we failed to find from the evidence.

It follows that the judgment against the appellant, Yates, should be reversed. It is so ordered. All concur.