ANNA C. MILLER, Respondent, v. CHARLES W. MILLET et ux., Appellants.

Kansas City Court of Appeals, January 14, 1907.

1. HUSBAND AND WIFE; Parent and Child: Alienation of Affections: Burden of Proof. In order for a wife to maintain an action against the parents of her husband for alienating his affections, there must be proof of malice, and the evidence must be judged from the standpoint of natural affection and interest which a parent has in the welfare of his child.

2. ———: ———: ———: Evidence. The evidence relating to the alienation of a husband's affections by his parents is reviewed and held to be insufficient to sustain an action.

3. ——: ——: ——: Furnishing Means: Instruction. Parents have a right to give their son money and clothing as they see fit, and if it is not done for the purpose of separating him from his wife, whether it is reasonably necessary is immaterial to their liability.

Appeal from Jackson Circuit Court.—*Hon. John G. Park*, Judge.

REVERSED.

*Karnes, New & Krauthoff* for appellants.

Filed argument.

*Bremerman, Heidelberger, Sherlock & Phillips* for respondent.

Filed argument.

ELLISON, J.—Defendants are the father and mother of plaintiff's husband, Harry Miller, and she brought this action against them charging them with having willfully and maliciously enticed, persuaded, influenced and induced their son to separate from and abandon her, etc. The judgment in the trial court was for the plaintiff.

The petition may be stated to charge that although the defendants are the parents of plaintiff's husband, yet that they have gone outside the limit and privilege of parents in dealing with their children and have willfully and maliciously induced their son to abandon plaintiff. We have had occasion in the case of Leavell v. Leavell (122 Mo. App. 654) to review the authorities (which are cited in counsel's brief in this case) on the requisites of proof or quantum of evidence necessary in a case of this nature, where the charge is made against the parents of the husband or wife alleged to have been enticed away from the other and affections alienated. It is there held that there must be proof of malice and that the

evidence must be judged from the standpoint of the natural affection and interest which a parent has in the welfare of the child.

In this case there was a total failure of proof. It appears that plaintiff was a widow with two children and her mother, and that she kept a boarding-house or hotel in Kansas City. Defendant's son, Harry, was thirty-five years of age, employed as a mail carrier and boarded with plaintiff, when, in November, 1901, they went alone before a justice of the peace and were married. He was not constant in his engagement as a mail carrier on account of broken health and the habit of drinking intoxicants. After they had been married several months (in July, 1902) he was taken very sick and so remained until perhaps February, 1903, at which time he was able to visit these defendants, who also resided in Kansas City. His mother considered the hotel as injurious to him in his feeble state of health. She thought he was afflicted with consumption and that he should go to some other climate. So it was arranged between them that he would go to El Paso, Texas, she furnishing the money with the father's consent. He stayed with his parents about a month before starting on this trip. They also paid his expenses including medicines. After an absence of about two months in Texas he returned to Kansas City, went to his mother's not improved in health, and in a day or two went to Excelsior Springs, where, in a few days, his mother and plaintiff went over to see him. Plaintiff stayed with him at one hotel and the mother was at another. He remained at the springs about six weeks, the mother providing a doctor for him, and plaintiff going back to see him several times. After leaving the springs he was in Kansas City a short time and then went to South Missouri. His parents were not in the city that summer and when they returned they learned that he had gone the South Missouri. He was again in Kansas City in the fall of 1904,

while plaintiff (who had quit the boarding-house or hotel business) was conducting a restaurant, when they lived together for ten days, he acting as cook. They quit that business and he again, as plaintiff states, went to his mother's and then to South Missouri and established himself on a small place in the country near Neosho, thinking that an outdoor life in that climate would be of benefit to him, his parents yet contributing weekly to his support.

The matters relied upon to show that these defendants willfully and maliciously persuaded and induced their son to separate from plaintiff are, singly, so inconsequential, and collectively so far short of establishing the charge that it is not necessary for their refutation, to do more than to name them. In the first place, the son was thirty-five years of age, and ought to be supposed to be free from an influence against his wife that was not based on fact, or on false information which he believed to be true. There is no pretense that these defendants ever concocted stories about the plaintiff and told them to the son. The record fails to show that they ever did anything more than permit him to come to their house at different times and to furnish him money wherewith to go to another climate in the hope of improving his health and to purchase medicines for him and otherwise contribute to his support. The plaintiff's testimony, as given by herself, does not show that the mother said in their conversations that she wanted him to go South for the purpose of abandoning her as her husband, but only to help his condition. The mother said that she did not think the boarding-house was a good place for him, not because plaintiff was there, but on account of his health. It is stated in the brief as a quotation from the record and in italics, that his mother insisted that plaintiff ought "not to expect him to live with her." There is no statement of that kind in the record. Plaintiff and the mother were in conversation,

when at Exclsior Springs with the husband and son, in regard to his condition; when the mother said that "she did not like to have him come back in the hotel." "She felt like she wanted him to go South." Plaintiff was then asked, "Did she say anything to you about when he was likely to go South, or whether they had determined on any time?" She answered; "No, sir, she did not; she said she didn't think I ought to expect Harry to stay there." Which, of course, meant that, on account of his health, he ought not to stay at the hotel but ought to go South. Plaintiff, herself, stated at another part of her testimony that the mother said she thought, "Harry ought to go to some other climate;" and that, "I ought not to expect Harry to come back to the hotel there to live." Again, it is quoted as though from the record (pages given) that the mother said to her when she was at the mother's house, "Oh, you are here again, are you?" The emphasis made by the word "again," is not in the record. It is further quoted (pages given), "You ought not to expect him to live with you," and, "You ought not to expect him to come home to you." There is nothing of that kind in the record. We only refer to these to show the manner in which the evidence has been misconceived. The most trivial matters are suggested as evidence supporting the petition. For instance, that the mother did not inform her when her husband returned from Texas; nor that he had gone to Excelsior Springs, and other matters equally as foreign to the action. Indeed, there is nothing in the entire case concerning what is insisted that the mother did not do, that she was under the slightest obligation to do. A letter from the mother to Harry while he was at Excelsior Springs was put in evidence, reading as follows:

"Dear Harry: I just called up Anna to see if she went to the Springs & found she did not. She did not like it one bit to think you went past their place and

did not stop to see her. She said it looked very childless to her for you to pass by without calling; she said why did he not stop & have me go down with him. She said she did not get your letter in time to be there when you said you would meet her & she could not go now until she heard from you as she would not know where to find you. Anna said she knew you would not stay long when you went away. I would like to know if you were successful in getting a good room. Is they many strangers in the city yet? Where is the bath house? I don't believe I ever saw it, maybe it has been built since I was there. How are you feeling? I must quit & help about dinner a little. It rained last night & yesterday, also raining today. One year ago we were having our flood. You better burn this so if Anna comes she will not get hold of it.     Your loving Mother."

We do not see what there is in the letter that in the remotest way bears on the charges against the defendants. The request to burn the letter so that plaintiff would not see it was explained as having been made because she thought plaintiff might be mad because she wrote to him of her displeasure.

A witness, Abbott, was introduced by plaintiff. He called on the mother to see if she could do something for Harry to break his drinking habit. He stated that she told him that, "She hardly thought Harry made a good selection as a wife. That they were going to send him West, to California or Mexico, I believe, somewhere out there, for his health, and try to keep him away from Mrs. Miller at their expense; that they thought his health was every poor, and they felt interested in their own son, and thought they should look after him." What was meant by going to "try to keep him away from Mrs. Miller," was clearly shown by the witness further on. He said "they thought Mr. Miller (the son) had the consumption at that time; this was my second visit out there; and that he needed the assistance of a physician,

and they *continued* to say that they were going to try to keep him from the *hotel."* He stated on cross-examination, that, "She (the mother) said he ought to be taken away from that *hotel,* as they didn't think it was a proper place for him, that he didn't have the assistance there that he should have."

So from the beginning to the close of the evidence, there is nothing, which, interpreted with any sort of reason or fairness, can be called proof of plaintiff's case. On the contrary the defendants, as was clearly pointed out by their counsel at the argument, seem to have been controlled throughout by the laudable and natural impulse to aid their son in his distress — not distress of his marital relation, but bodily condition. They kindly and generously furnished him money to go to different parts of the country in search of health. He returned more than once and lived with plaintiff and at no time do we find that defendants were endeavoring to have him abandon her. If he neglected her without cause, or treated her with discourtesy, we do not see how that can be made a cause of action against his parents, unless we are prepared to say that there follows from the parental relation, a legal obligation to stand surety for the good behavior of the married child.

There were several errors in instructions, which would have demanded that the cause be remanded. But in view of our disposal of the case it will not be necessary to examine these in detail, further than to say that defendants offered an instruction informing the jury that they had the right to furnish money and clothing to their son if it was not done for the purpose of inducing him to leave the plaintiff as his wife. This was amended so as to make it mean and be understood, that they could not do so unless the money and clothing "were reasonably necessary." They also asked to have the jury told that they had a right to send money to their son when he was absent, if not done to separate him from plain-

tiff. This was qualified so that it would read that they could not do so unless the money "was reasonably necessary for his support while absent." If defendants did not give their son money and clothing for the purpose of separating him from plaintiff, it is difficult to understand how furnishing him more than was reasonably necessary should make them liable.

The judgment is reversed. All concur.