Grace V. Howard v. Sidney Emeline Boyle, Appellant.—73 S. W. (2d) 228.

Division One, June 12, 1934.*

*Boyle & Priest, Robert E. Moloney* and *George T. Priest* for appellant.

*NOTE: Opinion filed at September Term, 1933, April 19, 1934; motion for rehearing filed; motion overruled at May Term, June 12, 1934.

*Foristel, Mudd, Blair & Habenicht* for respondent.

GANTT, J.—Action to recover $100,000 actual and $100,000 punitive damages for the alleged alienation of the affections of plaintiff's husband by defendant. Verdict for $60,000 actual and $60,000 punitive damages. On motion for a new trial, plaintiff remitted $35,000 of the actual and $35,000 of the punitive damages. Thereupon the motion for a new trial was overruled and judgment entered for $50,000. Defendant appealed.

The petition contains evidential matters and covers sixteen pages of the printed abstract. In substance it charged that defendant deprived plaintiff of the aid, companionship, and protection of her husband by wrongfully and maliciously alienating his affections. The answer was a general denial.

Defendant contends that at the close of the case the court, as requested by her, should have directed the jury to return a verdict for defendant. In substance the evidence for plaintiff follows:

On April 22, 1925, plaintiff, seventeen years of age, and Lloyd Boyle Howard, eighteen years of age, were secretly married by a justice of the peace in St. Charles, Missouri. They will be referred to herein as Lloyd and Grace. Lloyd was adopted by defendant, Miss Sidney Emeline Boyle, when four years of age. At the time of the marriage they lived at the Chase Hotel in St. Louis. At said time Grace worked at the Melbourne Hotel and resided with her mother in said city. They married at eleven A. M., and went to the home of Grace's mother. As usual Grace went to her work at six P. M. Lloyd then went to the Chase. Grace told her sister of the marriage. The sister advised with a Mrs. Hamilton, who went to the Chase that evening and exhibited the marriage certificate to defendant. Defendant stated that she would have the marriage annulled. Mrs. Hamilton replied: "Well, I think you had better pray about it. Grace is a lovely little girl. I have known her for some time in the Coffee Shop. I have seen her daily, and I have never seen her do one thing that could be criticized. She is very affectionate in her disposition and very teachable. You can mould her into most anything you wish."

"Q. What did she say? A. Well, I do not recall just what she said, but I am sure it did not meet with her approval.

"Q. You can give us the substance of what she said after—

A. (Interrupting) Well, she told me that Lloyd was under the care of doctors.

"Q. Did she say anything more about the annullment as you left? A. No.

"Q. How? A. She said: 'I won't say anything until I talk with my lawyers.'"

Immediately, defendant inquired of Lloyd about the matter. He admitted the marriage on learning that defendant had seen the marriage certificate. Defendant then sought the advice of friends, including her lawyer. She was advised that the marriage could be annulled. She stated that if "scriptural" she would do so. Lloyd stated that if the marriage was annulled he would remarry Grace. Defendant consulted another lawyer, but instituted no suit to annul the marriage. At the time of the marriage Grace knew that Lloyd lived at the Chase with his wealthy mother and that he had never worked. She procured him a job as usher in a theater, for which he was paid $15 a week. Grace was paid $11 a week and received "tips." They rented a room on Westminster Avenue and thus started married life. They continued to work for two and one-half months and lived in said room. Lloyd went to the Chase for changes of clothing and frequently engaged in conversation with defendant over the telephone. At the end of said time Lloyd became ill. Thereupon Grace called defendant and informed her of Lloyd's illness. Defendant notified Dr. Saunders, who called and prescribed for Lloyd. Lloyd had tuberculosis and a weak heart. He was having hemorrhages. The doctor told Grace that Lloyd had been under the care of four or five physicians. Grace did not know of Lloyd's physical condition. Later defendant came and for the first time met Grace. On exchange of greetings defendant asked Grace if she knew of Lloyd's physical condition when she married him. Grace said no. Defendant said Lloyd had been under the care of five physicians. She remarked that Grace and Lloyd looked hungry and gave money to Lloyd. In her testimony Grace denied they were hungry. Defendant said she would expect Lloyd at the Chase that evening, and left in a cab. Lloyd then asked Grace if she wanted to live at the Chase. He said defendant wanted him to take a "rest cure" but that he would not go without her. She was willing, and they went to said hotel. In other words, defendant, through Lloyd, invited Grace to the Chase. As usual, Grace went to her work at the Melbourne. After the first night's work Grace went to the Chase in a cab. Thus Grace became a member of defendant's family at the Chase about August 1, 1925. Lloyd and Grace occupied room No. 455, and defendant occupied rooms Nos. 427-428. Thereafter Lloyd made no effort to work. Grace continued to work at night for a week after moving to the Chase. Lloyd called at the Melbourne and accompanied her to the Chase after the night's work.

Grace testified that he did not appear sick. Defendant told Grace that Lloyd should not be out at night on account of his health and that she would rather Grace would not work. Thereafter Grace did not engage in any kind of work. Lloyd's "rest cure" continued for six weeks. Almost every night Lloyd would "sneak out" and he and Grace went bus riding. Defendant told Grace that she was not dressed like girls in defendant's circle of society. Grace said no. Defendant then said she would buy dresses for Grace. Grace consented. They went to Suzanne's and bought dresses. Grace told defendant the dresses were large. Defendant said Grace did not know how girls dressed. Grace thought she might not know and accepted the dresses. She admitted that defendant "may have thought the dresses proper." Defendant told the saleslady that the dresses belonged to Grace if she remained with defendant. The dresses were locked in the closet of defendant's sitting room. She would select the dress for Grace to wear. Grace wanted the dresses in her room. Each room, including defendant's sitting room, had a closet. The clothing regularly used was in the bedroom closets. The other clothing was in the sitting room closet, which was usually locked.

Defendant was a large woman and moved about with difficulty. She also had a weak heart and frequently remained in bed until noon. The maid called Lloyd about eight A. M. He read the Bible to defendant. Grace also read to her. She quit doing so because defendant criticized her pronunciation of words. Grace visited in defendant's room and conversed with her almost daily. If defendant was in a "nice humor" Grace remained for an hour or hour and a half. Frequently defendant visited with Lloyd and Grace in their room. Defendant stated to Grace that "the men in her (defendant's) church thought it was funny that Lloyd and Grace ran off to get married; that it looked like they had to get married." She also stated that Grace was a "common waitress, and that her parents were ordinary people." Frequently she made these statements to friends. She also stated to friends that "Grace had taken Lloyd's affections from her and that if Lloyd did not obey her she would discontinue his allowance." She sent word to a man that she did not want him to procure a job for Lloyd. She did not want Lloyd to work on account of his health. Defendant told Grace that she had interfered with Lloyd's education and ruined his life. Grace said that married people went to school and asked defendant to let them attend night school. Defendant said that "nice girls" did not go to night school. She offered to teach Grace and gave her a list of words to spell. If Graced missed a word defendant said: "A two year old child could spell better than that." On this account Grace discontinued study under defendant. After Lloyd's six weeks "rest cure" he sometimes drove defendant about in the afternoon. Grace was

not permitted to accompany them. Defendant said the doctor advised that Lloyd should be in the open air and away from Grace. However, Lloyd and Grace frequently used the car. They would leave the baby with Grace's sister and attend a show or engage in some other amusement. The baby walked when a year old. He annoyed defendant. She told Grace that she did not want the baby in her room and that she should keep the baby in her own room. Frequently Grace went to her sister's in the afternoon or visited friends and would meet defendant and Lloyd at the Y. W. C. A. where they usually ate dinner. At dinner defendant directed her conversation to Lloyd. She did not criticize Grace's manner but stared at her. At the Chase Lloyd and Grace ate together. Defendant ate alone.

Grace told defendant she did not believe she could stand her treatment any longer. Defendant said if Grace left she would keep Lloyd with her. Frequently she made these and similar statements in the presence of Lloyd. Lloyd said to defendant: ''That isn't any way to treat Grace; give her a chance, please.'' He made similar statements whenever he thought Grace was mistreated by defendant. Grace said ''there was always confusion; that it was not like an ordinary home,'' and that she ''tried awfully hard to please defendant.'' The first time Grace left the Chase she told Lloyd in the presence of defendant that she ''could not stand it.'' Lloyd said: ''Hell, that is all she wants you to do is to leave me.'' Grace left because her dresses were locked in the closet and were too large. She went to her mother's. Lloyd joined her the next day and begged her to return. Grace did so. Defendant did not change her treatment of Grace but told her ''to try to be a little better and do a little better.'' She told Grace she wasn't her equal.

Later Grace again left the hotel on account of the dresses and defendant's treatment. She remained away four days. Lloyd called on her every day. He cried and begged her to return and said he would shoot himself. Grace though he might do so and returned to the Chase.

In May, 1926, Grace's appendix was removed at Bethesda Hospital. Defendant was among the first to visit her after the operation. At that time Grace's sister stated to defendant: ''We cannot thank you enough for what you have done for our sister.'' Grace said to defendant: ''You have been kind, sweet and gentle to me, and I do not know how I can repay you.'' She asked defendant to pray for her. Defendant paid all the expenses of the operation. In due time Grace returned to the Chase.

Thereafter Grace was informed that her mother had been injured in an automobile accident in Kentucky. She asked defendant for money to go to Kentucky and be with her mother. Defendant said if Grace would not return she would give her the money. She also

said that Grace could not take the clothes that defendant had purchased for her. Grace then appealed to Lloyd. They had saved $60 from their allowance. On this money they went to Kentucky to be with Grace's mother, who was in a hospital.

On August 11, 1926, a reporter for the St. Louis Globe-Democrat interviewed Lloyd and Grace with reference to their married life. The interview appeared in the paper in an article which follows:

"Young Couple, Wed One Year, Still Are Glad They Married. Howard and Wife Disprove Predictions Union Would be Failure.

"Despite the ready predictions of many of their friends and intimates that their marriage would prove a mistake, a year ago when they eloped to St. Charles and were married at 19 and 18 years of age, young Lloyd Boyle Howard and his wife declared themselves, and outwardly seemed serenely happy as they sat at dinner in the Chase Hotel last night.

"Last May and July the story of their romance appeared in the newspapers. Young Howard, the foster son of Miss Sidney Emeline Boyle of Hotel Chase, daughter of the late Judge Wilbur Boyle, from whom she inherited an estate of $600,000, met Miss Grace Tolbert at Forest Park Highlands in June, two years ago. Their meeting came about when Howard pulled her from the deep water in the swimming pool.

"'It was love at first sight,' Howard said. His wife silently agreed. During the winter they met frequently at parties and often went to picture shows. She worked at the Melbourne candy shop. They decided to get married and slipped away in a friend's car to St. Charles and were married by a Justice of the Peace, giving their ages as 'more than 21.'

"Worked as Usher.

"Howard returned to his mother and told her of his romance and marriage. They argued, Howard declaring he loved his wife and intended to keep her. Howard then proved his mettle by getting a job as usher in the Missouri Theater at $15 a week. Both he and his wife worked for two months, living in a room on Westminster Place.

"Lloyd became ill with a bronchial affection in the right lung, and Miss Boyle generously offered the young husband and his wife a home with her at the Chase. Their life together has been very pleasant, according to the young couple.

"Lloyd and his wife have been married more than a year. Asked how he found married life, Lloyd said, 'It's fine. It keeps a fellow out of trouble for one thing.' Mrs. Howard interrupted and said, 'Don't get the impression that Lloyd married me to keep out of trouble.'

"Best Companion

"'I don't know of anybody who would be a better companion, better to go around with,' he added.

"'But surely you aren't always as agreeable as this?'

"'Oh, we do have spats, but they never last over-night,' Lloyd explained, and they both added, "You know, the path of true love never runs smooth.'

"Neither Lloyd nor his wife is working. 'I am supposed to be sick, you know,' he said: They are going away for the latter part of the summer, and may go to Florida to shoot alligators this winter. Their chief source of diversion is a new car Miss Boyle bought for them two months ago. 'I've already driven it 38,000 miles. It is a wonderful car. I can get twenty miles to the gallon and sixty-eight to seventy miles an hour from it,' he said.

"Adopted in 1912.

"Miss Boyle adopted Lloyd in 1912 when she found him—an orphan—ill in a hospital from a complication of diseases. She was won by his cheery disposition and sunny smile. She has sent him to private schools, employed tutors for him and taken him with her to Northern and Eastern resorts.

"Lloyd was asked whether he would advise another couple to embark on the sea of matrimony on a $15-a-week salary. 'No, sir; that was hard. Fifteen dollars a week isn't much. I'd wait until I made more. But Grace and I pulled through; it can be done.'

"They are a happy couple. They laughed last night at the memory of the predictions made at the time of their marriage that it would not last."

Later Grace again left the hotel on account of the dresses and defendant's treatment. She remained away four days. Lloyd called every day, begged her to return, and told her that he loved her. He said defendant agreed to try to do better. He cried and said that he couldn't control defendant's conduct. Grace returned with him. On each occasion when Grace returned defendant inquired where she had been. On Grace telling her, defendant said: "How do I know? I have no proof you have been there." Lloyd always said: "That is no way to treat her. Leave her alone, she is tired."

Thereafter defendant, Lloyd and Grace attended the Moody Bible Institute at Chicago. In Marshall Field's store in said city Grace told defendant that she was pregnant. Defendant "turned deathly white" and said that was a terrible thing to happen to Lloyd. At the hotel Grace told Lloyd what defendant had said. Defendant asked Lloyd if Grace was pregnant. Lloyd said to defendant: "That was a hell of a thing to say to her. If you don't want to do right by us we will stay here in Chicago." Defendant said if Lloyd and Grace left her their allowance would be discontinued. Even so, Lloyd said he did not want defendant to again talk to Grace about the matter. Defendant and Lloyd "fussed" for an hour. Lloyd cursed defendant, called her "all kinds of names." Defendant told him to "hush, hush, hush;" that she could not help Grace

being pregnant. Lloyd said: "Hell, no, you couldn't help it." He said that he would take care of the baby. She said: "If you leave me your allowance will be discontinued."

After a week in Chicago defendant, Lloyd and Grace attended a conference at Cedar Lake, Indiana. Defendant called Grace's attention to a girl in attendance and said: "Why can't you be more like that girl?" Often she said to Grace that she was "lowbred and from the lower classes." Frequently she did so in the presence of Lloyd. They were on this trip one and one-half months.

On returning to St. Louis they moved to defendant's home on Lindell Boulevard. Grace was not permitted to ride in the elevator in the home. She was allowed the freedom of the library and her room. She shared a bathroom with a maid. Lloyd used defendant's bathroom. Grace was sick at her stomach before the birth of the baby. Defendant said that worried her son. She said Grace should go to the basement and use that bathroom. Grace did not object to doing so. If Grace went to defendant's room defendant stopped talking and stared at her. Defendant, Lloyd and Grace had their meals together in the home until defendant became sick. At mealtime defendant ignored Grace and talked to Lloyd. She stared at Grace. Frequently Lloyd and Grace asked defendant to permit them to live alone. Defendant told them that if they left her she would discontinue their allowance.

Defendant became sick about a month before the baby was born. The nurses were under strict orders from the doctor to keep defendant quiet and to keep her room as peaceful as possible. She was dangerously ill with heart trouble and confined to her bed nine months. She managed the home by directing the maids. Lloyd and Grace had the run of the house. They came and went at pleasure. Defendant told Grace that she could either go to Bethesda Hospital or remain at home for the birth of the baby. The baby was born at the home. Defendant engaged nurses and Grace's physician for the occasion. She paid all the expenses incident to the birth of the baby. One of the nurses came four weeks before the baby was born. Defendant told her that Grace came from "ordinary people;" that she was not Lloyd's equal; that he read books; that Grace knew no more than a six year old child; that she had been "going out;" that she had suspicions as to the paternity of the baby; that she suspicioned Grace of having had a miscarriage, and that she had spoken to Lloyd about the matter. She said Lloyd told that her suspicions were unfounded; that Grace was a good girl when he married her and that she had continued to be a good girl. Defendant told the nurse that she wished she could have Lloyd without Grace.

Defendant furnished Grace with money to buy clothing for the baby. The nurse told defendant that Grace wanted the baby baptized in defendant's church. Defendant said the baby should be

baptized in Grace's church. On Grace's first visit to defendant with the baby, defendant said: "Oh, take the baby out, he is making me nervous. He is making too much noise." On other occasions defendant said that it was Grace's baby; that it did not look like Lloyd. Later defendant discovered that the baby had a short index finger like Lloyd's. She said that it was Lloyd's baby. During Grace's confinement her friends and relatives visited her. Defendant did not object to these visits but did not want visitors at other times. She did not want to be disturbed. She was in bed and had the nurse bring the baby to the room that her friends might see him. After she recovered she would hold the baby.

Grace took care of the baby's clothing until defendant said that she did not want the odor around the house. Defendant ordered the baby's clothing sent to a laundry. Grace prepared the baby's food, cleaned the utensils used in preparing the food and took care of the baby. Defendant informed Grace that she did not want the maids caring for the baby.

The first time that Grace left after moving to the Lindell Boulevard home was on account of the conduct of a maid. Grace reported the matter to defendant, who said she did not believe the maid was guilty of such conduct. This offended Lloyd, who said he would leave with Grace. Defendant knew that Lloyd was not able to work; that he was under the care of physicians, and that his heart was bad. She begged him to remain. He refused to stand the treatment. Defendant said she would cut off their allowance. Lloyd said he knew she would do so. Defendant told Lloyd not to take her car. He did so, and they moved to the home of Grace's mother. After a week defendant asked them to return. They did so, and the maid apologized to Lloyd and Grace.

About the first of February, 1929, they again left defendant's home because of the conduct of another maid. Lloyd told defendant that he would not return until she discharged the maid. Defendant said she would not do so. They rented an apartment and remained two weeks. Defendant then discharged the maid and asked Lloyd to return. They did so.

About April 1, 1929, defendant purchased a Rolls Royce car for $19,000. Thereafter Grace noticed a change in Lloyd. Prior to that time he was "crazy" about her and showed it by kissing her and holding her hands. Frequently he told Grace that he loved her, and on one occasion told her to pay no attention to defendant; that defendant was trying to get rid of her. Grace and the baby were not allowed in the new car. Defendant said the baby might soil the upholstery. However, Lloyd "sneaked" the car out and he and Grace went to a show. On another occasion the baby rode in the car. Lloyd was anxious to try the new car. He would leave Grace and drive the car for defendant. He gave defendant more

of his time and "no longer took Grace's part against defendant." If Lloyd and Grace were going out they left the baby with the maids. Grace wanted to live alone with Lloyd. She asked defendant to permit them to do so. Defendant said Lloyd's heart was bad. Grace said she would leave. Defendant said: "Well, if you leave this time I· am not so· sure Lloyd will go with you." Grace said: "Oh, yes, Lloyd will go with me anywhere· in the: world." On this occasion Grace· did not leave. ·

Later Lloyd and a friend, without defendant's permission, drove the Rolls Royce to Springfield, Illinois. Lloyd drank intoxicating liquor and smoked cigarettes to excess. About three A. M., of that night defendant awakened Grace and told her that Lloyd had been injured in an automobile accident. Grace began to cry, and defendant said: "If my son·dies, it will be your fault because you let him go out." Defendant·sent·to Springfield for Lloyd. On Lloyd reaching home he took Grace in his arms, kissed her, and told her that he was not badly hurt. Grace was thankful that he was not hurt. Lloyd then kissed defendant. She said: "It is about· time you are coming to kiss me." Grace then prepared· Lloyd for the doctor. · The car was insured and defendant purchased another Rolls Royce. Grace testified. that she did not think defendant received the second Rolls Royce until after she left on June 17, 1929. On that· day Lloyd and Grace were descending in the elevator to·the kitchen. He was teasing and tickling her. He was playful and made "funny·faces." In the kitchen·Grace proceeded to fix the baby's cereal. Lloyd continued to tickle· her. She asked him to stop. After feeding the baby they went to the: dining room. Lloyd continued to tease·and tickle her. This caused coffee to be spilled on Grace. She arose·from the table. Lloyd told her that he would quit teasing her. She resumed her· seat. He·again tickled her and she again arose from the table. Lloyd said: "Sit down." Grace said: "No." Lloyd again said: "Sit down." Grace again said: "No." She said she would wait. until he had finished breakfast. Grace started to move away and Lloyd "turned different colors," and in an angry manner "jumped up." He twisted her arm, slapped her, pushed her on the floor and kicked her. Defendant appeared and Grace told her of Lloyd's conduct. Defendant said she did not·believe Grace. Grace then told them she was leaving. She proceeded. to ·pack her things, during which time defendant followed her. Defendant refused to permit Grace to take a suitcase belonging to defendant. While Grace was packing her things Lloyd was in the back yard smoking a cigarette. Defendant refused permission to Grace to use the elevator to remove her things. However, Grace did so. Later Lloyd went to the library. Grace's sister came in an automobile. Defendant said to the sister: "I wish you could see how your sister is behaving." The sister did not answer. Grace's things were placed

in the car. ' The sister asked Grace if Lloyd was coming. Grace said Lloyd was in the house and "pretty blue." The sister said: "Isn't he coming with you?" Grace said: "He will be along later, I am sure." Grace went to her mother's. Grace telephoned to Lloyd every day. He told her he couldn't talk, to see his lawyer. Grace asked defendant to call Lloyd. On two occasions defendant called Lloyd to the telephone. Later the baby fell and fractured his wrist. At that time Grace and the baby were at her mother's home. Grace called the doctor. He said the wrist should be X-rayed. Grace had no money. She so informed Lloyd over the telephone. He said: "Have your sister take the baby to the hospital." Grace said the sister was not there. Lloyd said: "I do not know what to do. I can't talk." He did not send a cab to take the baby to the hospital. Finally the baby was taken to the hospital. Lloyd did not contribute to the support of Grace and the baby after she left defendant's home. He did not see the baby except when Grace drove by defendant's home while he was on the porch reading a newspaper. Grace held the baby to the car window. Lloyd went into the house. Thereafter Grace instituted this suit against defendant.

The evidence for plaintiff covers many pages of the printed abstract. It shows that defendant did not become reconciled to the marriage. The age of the young people, Lloyd's physical condition and his inability to support a family justified defendant's attitude when informed of the marriage. Furthermore, the secrecy of the marriage and the difference in the social life of the families caused defendant to have an uncertain feeling as to the "past life" of plaintiff. In this connection it should be stated that there is no evidence tending to show that plaintiff was not of good character. Defendant had great affection for her son and viewed the future with alarm. Immediately she responded to plaintiff's call for help when Lloyd became ill. She knew that Lloyd's affection for her did not equal his affection for plaintiff. In this situation she invited them to her home that she might continue to care for Lloyd. If she cared for Lloyd she must also support and care for plaintiff. Plaintiff feels the necessity of discounting Lloyd's sickness. She and Lloyd "sneaked out" and rode the busses during the time Lloyd was on a "rest cure." This shows that plaintiff was no aid to defendant in her efforts to control Lloyd and have him follow the directions of his physicians. We are not in doubt about the seriousness of Lloyd's physical condition. On the question it is said:

"It yet remains to be judicially sanctioned that parental solicitude for a child's felicity is a reprehensible quality, and that the natural grief and displeasure of the parent because of the child's marital alliance, which to the former seems apprehensive of the latter's future discontent, must give way to rejoicing, lest the parent should be exposed to liability in damages for having, by his disapproval, deprived

his child's spouse from the enjoyment of his or her anticipated advantages of the marriage, or that because of a marriage of the child, which the parent conceives to be ill-fated, the latter must, to avoid a similar liability, cast the former out, decline any longer to receive his child in his family, and refuse to succor it by means of. employment, shelter, and tender consideration.'' [Pollock v. Pollock, 29 N. Y. Supp.: 37, l. c. 38.]

''The instincts and the conscience unite to impose upon the parent the duty of watching over, caring for, counseling and advising the child at every period of life, before marriage and after marriage, whenever the necessities of the child's situation require or justify such action on the parent's part.'' [Cornelius v. Cornelius, 233 Mo. 1, l. c. 37, 135 S. W. 65.]

There is no evidence tending to show that the invitation of defendant to the young people to dwell in her home was grounded in bad faith.

Even so, plaintiff contends that defendant, after receiving them in her home, deliberately planned to separate them as husband and wife. She argues that defendant purchased the long and loose dresses to ''deflate'' her charms in the eyes of her husband. At that time they were ''wearing them short and tight.'' This did not meet with defendant's approval. Plaintiff admits that defendant may have thought the dresses were proper. In this connection she complained of the dresses being locked in the sitting room closet at the hotel. It is clear that the sitting room closet was an overflow closet and was locked because the sitting room was in some measure open to the public. There is no claim that plaintiff did not have access to her clothing after they moved to the Lindell Boulevard home.

Plaintiff also complained that defendant frequently in the presence of her husband referred to her parentage, education and social standing. She also complained that defendant stared at and ignored her in the presence of her husband. Of course, such conduct could not be approved. However, these complaints are not consistent with the statements made by plaintiff to the reporter who interviewed the young couple fifteen months after the marriage.

Plaintiff also complained of defendant's treatment when she told defendant that she was pregnant. In viewing the advent of an addition to the family, defendant had in mind the age of the young people and the added burden. Defendant confided to her nurse that she suspicioned the paternity of the baby. At that time defendant was seriously ill and confined to her bed. In this condition she attended to her business affairs through friends, attended to the home through maids, and attended to Grace's confinement through nurses. These confidential communications with her nurses and friends may well be charged to her illness and her responsibilities. [Kleist v. Breitung, 232 Fed. 555; Young v. Young, 35 Pac. 592; Leavell v.

Leavell, 122 Mo. App. 654, 99 S. W. 460; Sheriff v. Sheriff, 56 Pac. 960; Young v. Young, 8 Wash. 81; Fronk v. Fronk, 159 Mo. App. 543, 141 S. W. 692; Moir v. Moir, 165 N. W. 221; McCollister v. McCollister, 138 Atl. 472; Miller v. Miller, 122 Mo. App. 693, 99 S. W. 757; Corrick v. Dunham, 126 N. W. 150; Burnett v. Burkhead, 21 Ark. 77; Cooper v. Cooper, 171 Pac. 5; Townsend v. Holderby, 149 S. E. 855; Birchfield v. Birchfield, 217 Pac. 616; Hall v. Hall, 164 Pac. 390; Ogg v. Ogg, 260 Pac. 647; Hutcheson v. Peck, 5 Johns. (N. Y.) 196; Wilson v. Wilson, 98 Atl. 938; 13 R. C. L. 1474; Miller v. Levine, 154 Atl. 178.]

Plaintiff "tried to please defendant." On the other hand defendant "tried to treat plaintiff courteously and kindly." To plaintiff "there was always confusion. It was not like an ordinary home." She was unable to adjust herself to defendant's manner of living.

However, if defendant made efforts to separate the young people, she did not succeed in doing so. At the time defendant purchased the new car, Lloyd's affections for plaintiff had not diminished. Plaintiff so testified. She further testified that after the purchase of the new car she noticed that Lloyd "no longer took her part against defendant," and that he was occupied in and about the new car. She testified to no specific occasion when he failed "to take her part." She merely makes the statement that he failed to do so. After wrecking the new car Lloyd manifested the usual affection for plaintiff. Indeed, defendant complained that he was overlooking her. This occurred a short time before the separation.

Furthermore, plaintiff did not leave because of defendant's conduct. She left because of Lloyd's conduct. After the separation plaintiff talked with Lloyd several times over the telephone. He refused a reconciliation. There is no evidence tending to show that defendant was responsible for the assault made upon plaintiff by Lloyd on June 17, 1929, at defendant's home. And there is no evidence tending to show that defendant is responsible for Lloyd's refusal to again live with plaintiff as her husband. In McCollister v. McCollister, 138 Atl. 472, 1. c. 473, it is said: ·

"The nature of the claims so asserted (on charges of alienation) is such that such suits furnish a most convenient weapon for extortion and the right to bring them is a constant temptation to the unscrupulous. Every such case should be subjected, therefore, to the most careful scrutiny, not only of jurors, but by appellate courts. Especially is this true in cases in which parents are defendants. The common disagreements which arise among members of a family, the frank criticism of each indulged in by the others; words, spoken in haste and in the freedom of confidential family intercourse, taken out of their original meaning and reproduced in solemn testimony in a courtroom, magnified and distorted by bias, prejudice and interest, may be made to appear to carry inferences never originally understood or intended."

Plaintiff cites cases as follows: Nichols v. Nichols, 147 Mo. 387; 48 S. W. 947; Barton v. Barton, 119 Mo. App. 507; 94 S. W. 574; Surbeck v. Surbeck, 208 S. W. 647; Porter v. Porter, 258 S. W. 76; Cornelius v. Cornelius, 233 Mo. 1, 135 S. W. 65; Nelson v. Nelson, 296 Fed. 369; Wallace v. Wallace, 279 Pac. 374. In ruling those cases the court had under consideration facts different from the facts in the instant case. The court should have directed a verdict for defendant. The judgment is reversed. All concur, except *Hays, J.*, absent.