ARTHUR J. WEAVER, Appellant, v. PAULINE LEHMAN.—107 S. W. (2d) 81.

Division One, June 30, 1937.

*Earl M. Pirkey* for appellant.

*Foristel, Mudd, Blair & Habenicht* and *Claude W. McElwee* for respondent.

FERGUSON, C.—This is an action for damages for alleged alienation of the affections of plaintiff's former wife by her mother who is the sole defendant. At the close of the evidence on the part of plaintiff the defendant offered an instruction in the nature of a demurrer to the evidence which the trial court gave. After the instruction was given, but before the cause was finally submitted to the jury, plaintiff took a nonsuit with leave to move to set same aside. Thereafter and in due time plaintiff filed his motion to set aside the nonsuit and for a new trial which was, by the court, overruled and thereupon a judgment was entered dismissing plaintiff's cause of action. Plaintiff appealed and as the petition prays actual damages in the amount of $50,000 and puntive damages in a like amount, a total of $100,000, the appeal comes to this court.

The petition, filed in August, 1933, in the Circuit Court of the City of St. Louis alleges that plaintiff and Doris L. Lehman were married in September, 1929, and from that date until on or about July 1, 1933, lived together as husband and wife; that "defendant (the mother of the said Doris L. Lehman) willfully, intentionally, and maliciously enticed, influenced and induced plaintiff's said wife to leave and abandon him, etc.;" and that "since said abandonment, the defendant has willfully, wrongfully, . . . and maliciously detained and harbored plaintiff's wife and kept her separate and apart from plaintiff." The answer was a general denial.

The sole question presented for review is the sufficiency of the evidence, on the part of the plaintiff, to make a submissible case. In cases of this kind wherein parents are defendants the appellate court will subject the evidence to a close and careful scrutiny in determining its substantiality. [Howard v. Boyle, 335 Mo. 435, 447, 73 S. W. (2d) 228, 235.] We therefore undertake to state in a full, and somewhat detail, manner the evidence upon which defendant's demurrer was ruled. The evidence consists of the testimony of two witnesses, that of plaintiff himself and one other. The testimony of this other witness is of such slight consequence as to be of no practical probative value. Plaintiff's case therefore stands or falls on his own testimony, the more salient parts of which, stated in a narrative and chronological form, follows.

In September, 1929, plaintiff, age nineteen years, enrolled at the Arkansas State A. & M. College at Jonesboro, Arkansas. Prior thereto he had lived with his parents at East St. Louis, Illinois, where he became acquainted with Doris Lehman. At about the time plaintiff entered the Arkansas College, Doris Lehman, age sixteen years, entered school at Notre Dame Academy at Belleville, Illinois, a private Catholic school. She was a member of the class "corresponding to the first year of high school." Doris' parents, the defendant and her husband, went to California. After plaintiff entered the college at Jonesboro, Arkansas, he and Doris carried on a correspondence and shortly thereafter, sometime in September (1929), without the knowledge or consent of her parents, Doris went to Jonesboro, Arkansas, to visit plaintiff. During this visit they were married. Plaintiff procured a marriage license by representing that he was twenty-one years and Doris eighteen years of age. As stated they were at the time of the ages of nineteen and sixteen respectively. They agreed at the time "to keep the marriage a secret for two years" and Doris returned to school at Belleville, Illinois. About three weeks after the marriage plaintiff got a ride to St. Louis with a salesman, arriving there about nine-thirty on Saturday night. He met Doris that night for a few minutes at Eads Bridge Station. The next day, Sunday, she called for him at his parents'

home with her parents' automobile and they went for a drive during which they resolved to tell their parents of the marriage. They went to the Lehman home and told Mr. and Mrs. Lehman of the marriage and then called plaintiff's mother, by telephone from the Lehman home, and told her. There is no evidence whatever that either Mr. or Mrs. Lehman protested or even expressed disapproval. They seemed to have accepted the situation without complaint' and their conduct at the time and immediately subsequent certainly evidenced a purpose on their part not to interfere or interpose obstacles. In fact they continuously from that time to the time of separation ex- tended aid to these young folks as will appear from the subsequent recital of facts appearing, as will be remembered, from plaintiff's testimony. On either Monday or Tuesday following, plaintiff and Doris went to Jonesboro, Arkansas, where he resumed his study in the college and they commenced their marital life. Plaintiff had no funds or property, was not working at Jonesboro and his only income was $35 a month which his parents sent him. He said he thought he had a prospect of earning some money as a preacher while he was pur- suing his studies at Jonesboro but that "never materialized." How- ever the defendant regularly sent $35 a month to her daughter and plaintiff and sent them additional checks from time to time between these regular monthly remittances. This continued throughout the school year and thus plaintiff was enabled to continue in school and have his wife with him. Doris did not go to school at Jonesboro. Doris was "of the Catholic faith." Plaintiff was a member of a Protestant church, the Christian Church. She ceased attendance on the Catholic Church, attended church with her husband at Jonesboro and after "three or four months joined" that church. There is no least intimation that defendant sought in anyway to dissuade or influence her daughter against this course. While plaintiff and Doris were living at Jonesboro, Mr. and Mrs. Lehman went to Hot Springs, Arkansas, where they remained for some time in order that Mr. Lehman, who was in very poor health, a paralytic condi- tion, might take treatments. They drove to Hot Springs in their automobile and on their way went by Jonesboro to see plaintiff and their daughter. Plaintiff and Doris went with Mr. and Mrs. Lehman from Jonesboro to Hot Springs and then drove the Lehman auto- mobile back to Jonesboro so that they might use it there during the week and visit Mr. and Mrs. Lehman on week-ends at Hot Springs. They went to Hot Springs on Friday evening and visited with Mr. and Mrs. Lehman until Sunday evening each week while the Lehmans were there. Defendant paid the expenses, hotel room, meals, gasoline for the automobile, etc., of both plaintiff and Doris on each of the week-end visits to Hot Springs and gave Doris money to buy gasoline for the car during the time she and plaintiff had it

at Jonesboro. At the close of the college term, in June, 1930, plaintiff took Doris to the home of his parents in East St. Louis where they lived during the summer of 1930. Plaintiff earned some money during the summer of 1930 selling advertising matter and at the end of the summer had about $65. In the fall of 1930 plaintiff entered school at the Illinois Teachers' College, at Carbondale, Illinois. Doris accompanied him but did not herself go to school. When plaintiff and Doris went to Carbondale Mrs. Lehman bought and presented them with a radio and also some furniture. At the close of the school year plaintiff sold the radio for $65 and used the money for his own purposes. While plaintiff and Doris were at Carbondale defendant regularly sent them $35 a month to aid in their support and plaintiff's parents sent them a like amount. As at Jonesboro the preceding school year, plaintiff had no employment and no source of income for the support of his wife and himself except these remittances. Doris being an expectant mother went, with plaintiff's consent and approval, to defendant's home about Christmas, 1930, where she remained until the birth of the baby on April 7, 1931. Defendant attended and cared for Doris during this time and plaintiff does not make any complaint of the attitude of defendant toward either himself or Doris during this period. Plaintiff continued in school at Carbondale. During the summer of 1931 plaintiff and his wife and baby again lived at the home of his parents in East St. Louis. Plaintiff solicited orders for clothing. Apparently his earnings were small. In the fall of 1931 plaintiff obtained a position as a teacher and coach of the basketball team in the high school at Brighton, Illinois, at a salary of $135 a month. This was the first steady work plaintiff had. It continued for nine months. Before going to Brighton plaintiff wanted to buy a used automobile. He found one which he deemed satisfactory at a price of $315. Defendant made the down payment of $100 for him and he later paid the balance of the purchase price in installments. While plaintiff and his wife and baby resided at Brighton they often visited the Lehmans and plaintiff's parents at week-ends and frequently at such times went to St. Louis where Doris bought clothes at a department store on defendant's charge account. While plaintiff was teaching at Brighton his parents moved from East St. Louis to St. Louis and at the close of the school year at Brighton plaintiff and his wife and baby went to live at his parents' home in St. Louis. Plaintiff did not obtain work until the latter part of July (1932) when he went to work for the Funsten Pecan Company at $16 a week. He did not return to teaching that fall and continued working for the Pecan Company until Christmas, 1932. At Christmas time 1932 plaintiff suffered an attack of appendicitis followed by an operation. After the return to St. Louis in the spring of 1932, Doris worked

at intervals in a department store. Upon his recovery and "in the early part of March, 1933" plaintiff took his wife, baby and his mother in his automobile, which he had purchased with defendant's assistance, with a trailer attached, and drove to some land which his father owned near Marianna, Florida. His twenty-six-year-old brother, Jack, had preceded them. It was planned to clear this land of timber and sell the timber at nearby stave mills. The only house on the land, which they undertook to adapt to the uses of a dwelling, was in a bad state of repair. It had three rooms, one large room, a little room used for the storage of some lumber and a kitchen. Part of the floor was gone, some of the window glass was out, and there were large holes in the roof where the shingles were off. Besides a crib for the baby, a present from defendant, they had two beds. Plaintiff and his wife slept in one bed and plaintiff's mother and brother Jack occupied the other. They all slept and dressed in the same room. There was no water in or near the house, the water supply being about a mile away. Every third day plaintiff would take a barrel in the trailer and get fifty gallons of water. They had no stove for cooking and all of their meals were prepared and eaten at the home of a negro who lived about a fourth of a mile away. When it rained they tacked pieces of cloth over the windows to keep out the rain. Bed bugs and other insects added to their discomfort. Seeking protection against bed bugs and insects, the beds, including the baby's crib, were set in can lids filled with disinfectant solution. After living in this manner for about a month with no improvement in conditions Doris determined, of her own volition, to leave. There is not a scintilla of evidence that her mother, the defendant, influenced her in any way in this decision. Doris wrote to her parents asking for money to pay railroad fare to return to their home. Defendant responded with funds sufficient to pay both railroad and Pullman fare. However instead of Doris and the baby going by train plaintiff decided they would all return to East St. Louis and St. Louis and plaintiff, Doris and their baby, plaintiff's mother and brother all returned in plaintiff's automobile and trailer using the money defendant had sent Doris to pay the expenses of the trip. Plaintiff and his wife and baby visited in East St. Louis about three weeks during which they lived a part of the time in the Lehman apartment. The latter part of May, 1933, plaintiff and his brother Jack decided to again try the Florida venture. He wanted Doris to return to Florida with him by automobile but apparently she insisted that he prepare suitable living quarters there before she and the baby went there again and told him she and the baby would stay with her mother two weeks and then come by train and that her mother would give her train fare. When plaintiff and his brother left on this trip for Florida defendant gave plaintiff $15 to be used

in renting a house in the town of Marianna. She also bought an oil burning refrigerator and shipped it to him at Marianna. Before leaving plaintiff sought to borrow $500 from Mr. and Mrs. Lehman but Mr. Lehman refused. After his arrival there he wrote Doris to try to borrow from $200 to $500, whatever amount she could, from her parents but they did not comply with the request. Plaintiff rented and furnished a house in Marianna and Doris, the baby, and plaintiff's mother went by train and joined plaintiff and his brother there. The house was but partially furnished for the comfort of so many occupants. They had a bedroom suite, which defendant had given them, and plaintiff had by buying a dresser and rug and using the beds they had on hand, fitted up sleeping quarters. The living room had a divan, two chairs and a rug. They dined in the kitchen using the kitchen table with two kitchen chairs and empty packing boxes for seats. The house was equipped for electric lights but plaintiff, though his wife urged him to do so, would not have electricity turned on. They quarreled about that. Finally she had the electricity turned on paying the charge therefor herself. She then asked plaintiff to permit her to buy an electric iron and pay for it on installments. Plaintiff refused and they quarreled about that. It is apparent, and the inference inescapable, that Doris, whether rightly we do not undertake to say, felt she was being subjected to unnecessary hardship and that the work she was called upon to do and the manner of their life imposed a burden beyond her endurance. She declared she "would not live down there like a negro and work like a negro." Again she wrote her parents asking for money to come to their home. Again there is no evidence whatever that the mother in any way incited or influenced Doris in this decision. It was, so far as this record shows, her own voluntary decision. Defendant sent Doris the money for railroad and Pullman fare and she and the baby went to her parents' home in East St. Louis. This marked the final separation. It is, we think, clearly inferable that it was understood between plaintiff and Doris at the time that it was to be a final and permanent separation and that Doris would apply for a divorce. When she left for the home of her parents plaintiff went to St. Petersburgh, Florida, and very shortly thereafter wrote a letter to Doris from that point in which he made the following statements: "I have been doing a lot of thinking . . . I guess you were right in leaving me . . . there is one thing I am sure of and that is we are not suited for each other, our ideals and our ideas are so different that I doubt our being happy later on. I love Freddie and hope you can see my side and agree to let me have him half the time. I think that would be fair." Plaintiff stated, in effect, that what he said about the custody of their child had reference to the contemplated divorce proceeding. Another

letter to Doris written shortly after she left refers to a divorce and custody of the child and evidences that such course had been discussed at the time of the separation. In these letters plaintiff did not charge or intimate that defendant had in any way contributed to the separation. Plaintiff returned to East St. Louis about July 13 (1933). On the 21st of July he drove in his automobile to the Lehman home and asked Doris to go for a drive with him. On this drive he berated her, told her she was not fit to be his wife and the mother of his child and used other abusive language. He said, that he lost his temper and struck her in the face three times, that she cried and he took her home. Sometime after this drive, and both verbal and physical assault upon his wife, plaintiff sent his brother to the Lehman home with a request that the baby be permitted to visit him for the day and Doris permitted the baby to go, in care of the brother, to visit plaintiff as requested. About a month after the occasion of the assault, and sometime in August (1933) plaintiff went to a drug store "across the street from the apartment where the Lehmans lived" at about seven o'clock, P. M., and called the Lehman apartment by telephone saying he would "like to see Freddie and take him" to the home of his parents "for the evening." Mrs. Lehman answered the telephone and stated that Doris had gone out in the car to get the baby asleep. Whereupon plaintiff "hung up." Plaintiff stated the subsequent events in substance as follows: that he stood around watching the Lehman apartment; that within twenty or thirty minutes he saw an automobile driven by a man accompanied by Doris carrying the baby, asleep in her arms drive into the driveway of the Lehman home, that thereupon he drove his automobile with the lights on into the driveway behind the automobile in which his wife was seated; that the man with his wife carried the sleeping baby into the house; that as his wife started toward the house he went up to her and commenced talking to her about a man carrying his baby, etc.; that as his wife went on into the house he continued talking to her about the matter; that the defendant then came out of the house and he told her he "didn't like the idea of other men carrying the baby around" and that defendant said, "there wasn't any other man, that was me carried the baby in the house" and that he said, "it wasn't, I had my lights on," that defendant then went back into the house; that he then went to the back door and knocked and defendant came to the door and asked him what he wanted; that he said he wanted to see "my boy" and defendant said "go around to the front door;" that he went to the front door and was met there by his wife with whom he conversed for awhile, the purport of the conversation is not stated; that defendant appeared and told him after he had finished his conversation with Doris "to get away from here, if you don't I'll

call the police and have you arrested" and "I can't let them (Doris and the baby) see you any more." So far as appears plaintiff never thereafter attempted or requested to see either Doris or the baby. From and after the time his wife left him at Marianna, Florida, plaintiff did not contribute, or offer to contribute, anything to support of either his wife or baby. Doris applied for and was granted a divorce without contest. Later she remarried and then this action was filed seeking damages from her mother.

Plaintiff accuses defendant, and rests his case for alienation and $100,000 in damages, on the following; that when the Lehmans were at Hot Springs in the early or first part of 1930 at which time plaintiff and Doris visited them each week as above recited, defendant was not, as plaintiff seems to think, as enthusiastic and joyous about her new son-in-law as plaintiff apparently thought she should be. He thought there was a tendency on her part not to accord him the deference he seemed to think his due and this despite the many and continuous acts of assistance at the very time extended by defendant to plaintiff which made it possible for him to continue in school and have his wife with him without cost or expense to him. Plaintiff says that during the visits with the Lehmans at Hot Springs (remote in time from the separation) defendant did not introduce him as her son-in-law but would introduce his wife as "my daughter Doris" and then introduce him merely as Arthur Weaver and plaintiff adds the vague complaint that during those visits defendant did not engage in "general conversation" with him; and that while the Lehmans were at Hot Springs, which it will be recalled was shortly after the announcement of the secret marriage of their sixteen-year old daughter, in the first grade of high school, to this nineteen-year old school boy without means for even his own support, the defendant was heard to remark to friends that "its a shame my daughter married so young" and "I hate to see her married." Next plaintiff says that in the spring of 1931 when he and his wife were living at Brighton, while he was engaged in teaching there, Doris went alone for a short visit with her parents at Hot Springs and that when she came back she "seemed cool towards me and dissatisfied" but after a week or so she was alright and that he thought he observed the same attitude on the part of Doris, during their residence at Brighton, on another occasion or so after a visit to her parents' home but always she "would be alright . . . the same as before in maybe a week." If this opinion or idea of plaintiff's be accorded the fullest significance yet we find nothing in the record to warrant an inference that defendant in any way, by word or act, contributed to this passing and temporary attitude on the part of Doris. At that time defendant had paid $100 on their automobile. given them the larger part of the furniture with which they furnished their home,

and Doris was buying clothes on defendant's account, all of which was contributed to assist plaintiff and Doris. Plaintiff undertakes to emphasize several isolated incidents occurring in the approximately four years he and Doris lived together as husband and wife. They are, however, so trivial as to afford no support to the cause of action alleged. Illustrative is the claim made on direct examination that on some visits he and Doris made to the Lehman home defendant did not extend to him a direct invitation to dinner and that when dinner was announced Doris would say "Come on Art." But on cross-examination he narrowed his testimony about the matter. It was then developed, and plaintiff admitted, that each Christmas he and Doris visited in the homes of both his parents and the Lehmans, having noon dinner with his parents and dinner in the evening at the Lehmans; that each Christmas the Lehmans had a large number of relatives as dinner guests so that a first and second table was served; that Mrs. Lehman personally cooked the dinner and when ready to serve merely announced "dinner is ready;" that such was the occasion when Doris turned to him and said, "Come on Art," and to which his direct examination referred; and that he and Doris always ate at the first table while defendant served the dinner. Each Christmas he and Doris attended a Christmas tree party at the Lehman home at which an exchange of presents among the members of the family was made. Mr. and Mrs. Lehman always remembered him with an appropriate present. He at first undertook to intimate some kind of discrimination at such times but his cross-examination developed that such intimation was without any foundation whatsoever. The last incident upon which plaintiff places emphasis is the occasion of his last trip to the Lehman home, related above, culminating in the remark he says defendant made that after he had finished his conversation with Doris "to get away from here" or she would call the police and concluding with a statement, to the effect, that she would not permit him to come there again to see Doris or the baby. It must be remembered that this was long after the separation which occurred in Florida; that plaintiff had acquiesced in the separation, as evidenced by his letters; that he never at any time, so far as appears, attempted to bring about or desired a reconciliation; that since the separation he had come one time prior thereto to the Lehman home, had been received there, had taken Doris for a drive, which he made an occasion for angry and abusive accusations against Doris and he admits, without provocation on her part, he assaulted her, striking her three times in the face, and returned the weeping and frightened girl to defendant's home. At this time a month later he did not first go to the Lehman home but cautiously phoned from across the street and then waited until Doris returned home. He then commenced again to talk to her in an

argumentative if not angry manner. We do not perceive how defendant's cónduct at that time, and under the circumstances, lends any support to the cause of action alleged. It does not tend to show that she was keeping or attempting to keep Doris from plaintiff for, as stated, plaintiff did not seek a reconciliation nor to have Doris return to him, nor express such a desire, nor is there any evidence tending to show the least inclination or desire on the part of Doris to do so.

There was no evidence that defendant ever made any complaint to or against plaintiff concerning the marriage, or his failure or inability to support her daughter, or ever said anything derogatory of plaintiff or to his disparagement, or ever suggested that Doris ought to leave plaintiff or in incitement of her to do so. On the contrary continuously from the day when informed of the secret marriage to the day of separation defendant aided them in innumerable ways. Apparently plaintiff has proceeded upon a theory that when he married her daughter some kind of obligation, either moral or legal, devolved upon defendant to assist them more generously than she did and that had she done so his wife might not have left him and for defendant's delinquency in that respect she should be penalized in damages. As appellant plaintiff makes fervent argument about the marriage relationship and, in effect, the duty of a wife to follow and accept the husband's fortunes for better or worse. The merit of Doris' decision to separate from plaintiff is outside the issues of this case. Plaintiff's letters indicate other and more fundamental causes may have contributed to cause the separation than the hardships alone to which she thought she was being subjected. Be that as it may and returning to the case under decision we find no substantial evidence, tending to show, or which affords a reasonable inference to that effect, that defendant was the procuring cause of, or incited or actively contributed to cause, the separation.

A discussion or analysis of the cases cited and the legal principles governing cases of this character is unnecessary. In cases of this kind, "the law recognizes the natural solicitude of the normal parent for the welfare of his child and will not condemn the interest and even interference a parent may be prompted to manifest and interpose in his child's domestic affairs, as long as his conduct is actuated by a bona fide endeavor to serve the child's best interests." [Fronk v. Fronk, 159 Mo. App. 543, 141 S. W. 692. Other cases ruled by our appellate courts to which reference may be had are: Howard v. Boyle, 335 Mo. 435, 73 S. W. (2d) 228; Beckler v. Yates, 338 Mo. 208, 89 S. W. (2d) 650; and Raleigh v. Raleigh (Mo. App.), 5 S. W. (2d) 689.] In the instant case, as we have pointed out, we find no substantial evidence of improper interference by the defendant with the marital relation. To hold that defendant "trans-

gressed the limits of parental propriety would be to hold that a parent cannot obey the impulses of true parental love without being fined in damages.'' [Fronk v. Fronk, supra.] The judgment of the trial court should be, and hereby is, affirmed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.